**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 0:26-cr-025-LMP-DLM |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S** |
| | ) | **CONSOLIDATED OPPOSITION** |
| v. | ) | **TO DEFENSE MOTIONS FOR** |
| | ) | **DISCLOSURE OF GRAND JURY** |
| NEKIMA VALDEZ LEVY | ) | **TRANSCRIPTS** |
| ARMSTRONG, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Journalists are not above the law. Nonetheless, defendants Don Lemon, Georgia Fort, and Shane Bollman ("Defendants") claim that, because of their alleged status as "journalists," they were indicted improperly by a grand jury for their role in attacking a church during Sunday worship services. As they see it, Defendants were just "doing their job," and they demand transcripts of the grand jury proceedings because they are convinced – without any legitimate basis – that the Government must have misadvised the grand jury about something or engaged in some other misdeed when presenting the indictments in this case. Although they acknowledge (as they must) that grand jury proceedings are "ordinarily protected from outside scrutiny," Defendants insist that they and the Court "can *assume* the grand jury proceedings were

[irregular]" because (in Defendants' view) "everything in this case has been irregular." (Mot. at 1.)[1]

Defendants' motions should be denied. Defendants are not entitled to the grand jury transcripts. Their occupation as journalists and any First Amendment defense they eventually may raise are irrelevant at this stage. Their claims of irregularity are premised on false accusations that federal officials have made public misstatements of law or otherwise politicized this case.

## BACKGROUND

On Sunday, January 18, 2026, a large mob of agitators descended on Cities Church in St. Paul, Minnesota. According to the superseding indictment, the agitators conspired to disrupt a liturgical worship service in "a coordinated takeover-style attack." (Dkt. 144 at 3.) Because of this attack, the pastor and congregants were forced to end their worship service. (*Id.*) Several congregants fled the Church, fearing a mass shooting. (*Id.* at 12.) In the rush to escape, one congregant suffered an injury. (Dkt. 23-1 at ¶ 43.)

The superseding indictment alleges that the agitators gathered for a "pre-operation briefing" the morning of January 18, 2026, before their attack

---

[1] Lemon and Fort filed a joint motion to disclose grand-jury proceedings. (Dkt. 125 ("Mot.").) Bollman filed a separate motion for that relief and joined Lemon and Fort's motion. (Dkt. 441 at 1 ("Bollman Mot.").)

on the Church. (Dkt. 144 at 8.) Defendants Lemon, Fort, and Bollman joined with the other co-conspirators at the pre-op meeting. (*Id.*) During a livestreamed interview, Lemon allegedly "thanked defendant ARMSTRONG," one of the organizers of the attack, "for what she was doing and assured her he was 'not saying what's going on' (*i.e.*, was not disclosing the target of the operation)." (*Id.* at 9.) Lemon further informed the viewers of his livestream that he was "going to head to the operation" and was "not going to give any, any of the information away." (*Id.* at 10.)

Lemon and Fort, separately, "traveled to the Church to engage in the planned takeover-style operation." (Dkt. 144 at 11.) In a conversation with two co-defendants, Lemon openly admitted that he did not "think we can go inside" but proceeded to enter the Church anyway. (*Id.*) Once inside the Church, Lemon and Fort "physically obstructed [the] pastor's freedom of movement" and refused to leave the Church when asked by the pastor to do so. (*Id.* at 15.) Lemon "confronted some congregants and physically obstructed them as they tried to exit the Church." (*Id.* at 16.) Bollman also was present at the Church and engaged in similar conduct. (*Id.* at 18.)

The Government promptly worked to identify the perpetrators of the attack on Cities Church. On Tuesday, January 20, 2026, the Government filed a criminal complaint against the eight then-identified perpetrators, including Lemon and Fort. (Dkt. 23.) The Court approved issuance of arrest warrants

for three of the eight defendants.  (Dkts. 2, 3, 4.)  In relevant part, the Court

did not issue warrants for the arrest of Lemon or Fort, determining that there

was no probable cause based on the facts set forth in the complaint.  As the

Court knows, however, the Government had the proper and legitimate option

of proceeding as it did here -- by presenting the case to a grand jury.

Because of its legitimate concern that the defendants' offense conduct

might lead to copycat crimes and potentially to violence and injuries, the

Government appealed to a randomly assigned District Judge to seek review of

the decision to reject the complaint affidavit as to the five other defendants.

The Government later sought review pursuant to a petition for writ of

mandamus because of the necessity of a prompt ruling.  *See In re United States*,

No. 26-1135 (8th Cir.), Resp. to Pet. for Mandamus at 2.

Again, there was nothing improper about the Government's efforts.  The

Government was trying to protect the First Amendment rights of all people to

worship freely in their houses of worship and avoid violence and injuries

happening at houses of worship across the country.

The petition sought an order directing this Court to issue arrest

warrants against the remaining five defendants based on the complaint

affidavit.  The Eighth Circuit denied the petition.  In a concurring opinion,

however, Circuit Judge Grasz noted that "the Complaint and Affidavit clearly

establish probable cause for all five arrest warrants" and that the district court

4

lacks "discretion to refuse to issue an arrest warrant once probable cause for its issuance has been shown." *In re United States*, 2026 WL 185713, at *1 (Grasz, J., concurring).

On January 29, 2026, a grand jury indicted Lemon, Fort, and the other three defendants for whom the Court declined to issue arrest warrants (as well as one additional defendant). (Dkt. 39.)

Defendants have moved for disclosure of the grand jury transcripts. (Dkt. 125; Dkt. 441.) Citing public statements by the President, Attorney General, Deputy Attorney General, and Assistant Attorney General for the Civil Rights Division—as well as the procedural history of this case—they argue that the Government was motivated by "political pressure" and "went to extraordinary and unprecedented measures to obtain a complaint against Mr. Lemon and Ms. Fort." (*Id.* at 15, 17.) As a result, they believe the Government may have engaged in misconduct or "overreach" before the grand jury. (*Id.* at 20.) They also argue that the Government "is not entitled to the presumption of regularity" because the Government exercised its legal right to seek mandamus and because (in their view) "everything is irregular and troubling" in this case. (*Id.* at 20-21.)

## ARGUMENT

Federal Rule of Criminal Procedure 6(e) "codifies the traditional rule of grand jury secrecy." *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 425

(1983). The Rule forbids disclosure of grand jury transcripts unless specific and very narrow exceptions apply. Defendants attempt to invoke one such exception: Rule 6(e)(3)(ii), which allows a court to order disclosure of grand jury transcripts "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).

A defendant moving for disclosure under Rule 6(e)(3)(E)(ii) must make "a showing of particularized need for grand jury materials before disclosure becomes appropriate." *United States v. McDougal*, 559 F.3d 837, 840 (8th Cir. 2009). "In order to demonstrate a particularized need" a party must show that the request for disclosure is "(1) required to avoid possible injustice in a different judicial proceeding, (2) greater than the need for continued secrecy, and (3) specifically directed at the material required." *McDougal*, 559 F.3d at 840 (cleaned up). In their pending motions, Defendants fail to make the required showings.

## I. The Court Should Not Order Disclosure of the Grand Jury Transcripts

### A. Disclosure of the Grand Jury Transcripts is Not Required to Avoid Injustice

Defendants argue that the interests of justice demand release of the grand jury transcripts because the "extraordinary set of events that led to this

6

indictment reveals a significant risk that the government misstated key facts or elements of the offenses charged during its presentation to the grand jury." (Mot. at 12.)  They identify two categories of "extraordinary" events.  First, they insist that the Government has "articulated views about purported criminal liability by journalists that are squarely at odds with the FACE Act itself" and therefore may have made "misstatements" to the grand jury about "the basis to indict journalists."  (Mot. at 14-15.)  Second, they accuse the Government of "engaging in highly unusual conduct simultaneous to political pressure to bring charges."  (Mot. 15.)  These accusations are unfounded and do not entitle Defendants to overcome "the indispensable secrecy of grand jury proceedings." *United States v. Johnson,* 319 U.S. 503, 513 (1943).

### 1.     Defendants' Claimed First Amendment Concerns Are Misguided and Inapposite

Defendants speculate that because certain Government officials made (in Defendants' view) supposedly false public statements about the First Amendment, journalism, and the FACE Act, the Government's counsel of record may have made similar statements to the grand jury, necessitating dismissal of the indictment.  Their fears are groundless.

Contrary to Defendants' claims, the Government has not "made repeated public assertions about this case that contain fundamental misstatements of the law."  (Mot. 13; *see also* Bollman Mot. 10-11.)   Defendants' argument

focuses on the following statements about journalists.  Referencing the attack on Cities Church, Attorney General Pamela Bondi posted on social media that journalists "have no right to do that."  (Mot. 6-7.)  Deputy Attorney General Todd Blanche stated in an interview that "freedom of the press extends to a lot of different areas, but it does not extend to somebody just trespassing and being embedded with a group of rioters."  (Mot. at 7.)  Assistant Attorney General for Civil Rights Harmeet Dhillon similarly explained on social media that the First Amendment does not protect "disrupting a prayer service."  (Mot. at 8 n.12.) She added that journalists cannot 'just do anything [they] want anywhere … If you wear the badge 'journalist' or you claim, 'I've got a microphone, I'm a journalist,' that is legally irrelevant in the statute."  (Mot. at 13 (emphasis omitted).)[2]   She separately stated that, "Invading private property isn't protected speech & claiming 'I'm a journalist' doesn't give you a pass to break the law." (*See* Bollman Mot. at 10 n.4.)

These statements are *correct*.  The press "has no special immunity from the application of general laws [and] no special privilege to invade the rights and liberties of others."  *See Associated Press v. NLRB*, 301 U.S. 103, 132-133

---

[2] After the Court declined to issue an arrest warrant for Lemon, Assistant Attorney General Dhillon stated that Lemon "is not out of legal jeopardy," that the Government is "not giving up the fight," and that Lemon's lawyer "had nothing to do with the magistrate judge refusing to sign off on arresting Don Lemon."  (Mot. at 7-8.)  These are accurate statements of fact and do not misrepresent the law.

(1937). And "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen v. Cowels Media Co.*, 501 U.S. 663, 669 (1991).

The FACE Act's house-of-worship provision, 18 U.S.C. § 248(a)(2), is no exception. As Assistant Attorney General Dhillon observed, Section 248(a)(2) prohibits *anyone* (*i.e.*, "whoever") from physically obstructing, intimidating, or interfering with those exercising the right of religious freedom at a house of worship, *for any reason*, even if they are journalists purportedly "doing their job." (Mot. 1.)

While Defendants point out (Mot. 13) that the FACE Act contains the truism that it does not "prohibit any conduct … protected from legal prohibition by the First Amendment," 18 U.S.C. § 248(d)(1), the above-referenced statements by Government officials about the applicable legal standard are not inconsistent with that provision. Therefore, Defendants' efforts to show any public misstatements fail. The cited public statements are correct and not unfairly prejudicial to Defendants. Fairly construed, the statements are designed to communicate to the public that the Department of Justice takes the concerns of all faith-based communities seriously and that it will seek to protect the First Amendment right of religious freedom within houses of worship. Moreover, the cited public statements provide no basis for

assuming that the Government's counsel of record made similar statements to the grand jury when presenting the indictment and superseding indictment. Defendants' concerns to the contrary are wholly unfounded and, as they admit based on rank assumptions. (Mot. at 1.)

Defendants also rely on two statements that President Trump made, but the President was expressing his opinion and did not make any factual misstatements. He referred to Defendants' conduct as "horrible," condemned them as "agitators," and opined that Lemon's conduct is more akin to "get[ting] paid" to "cause trouble" than professional journalism. (Mot. at 6.) The President's statements, as quoted in the motion, do not mention the FACE Act or make any assertions about the legality of Defendants' conduct. Moreover, as noted above, public officials need to be able to communicate to the public, and the public has a right to be able to hear from their elected representatives on matters of public interest. Contrary to Defendants' haughty intonations, there is nothing improper about the cited statements, and the courts have no legitimate role in policing such communications.

Defendants also wrongly argue that the Government had a duty to "inform the grand jury on this crucial statutory limitation" in Section 248(d)(1). (Mot. at 14.) However, that claim is easily dispatched because it so plainly wrong. It is well-established that an indictment cannot be dismissed because "the prosecutor failed to instruct the grand jury on affirmative defenses," which

10

are "a matter to be resolved by a petit jury." *People of the Territory of Guam v. Cruz*, 913 F.2d 748, 750 (9th Cir. 1990); *see also United States v. Sisson*, 399 U.S. 267, 288 (1970) ("It has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses...."; the Government was not required to negate defendant's religious objections to the draft when seeking to indict him for draft dodging because his objection was, at best, in the nature of an affirmative defense); *United States v. Clark*, 2011 WL 1990443 (D. Minn. May 23, 2011) (Tunheim, J.) (denying motion to dismiss indictment; holding, based on *Sisson*, that prosecutor was not required to present evidence of an affirmative defense when presenting indictment).

This rule follows from the "axiomatic" rule that "the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." *United States v. Williams*, 504 U.S. 36, 51 (1992). A grand jury does not "try the suspect's defenses" or "enquire upon what foundation the charge may be denied." *Id.* at 51-52. Thus, prosecutors have no "legal obligation to present exculpatory evidence" to the grand jury. *Id.* (cleaned up). Indeed, it "would be quite absurd" if a prosecutor had to disclose to the grand jury "what he knows in defense of the target of the investigation." *Id.* at 52. Because "Supreme Court precedent establishes that an indictment need not anticipate affirmative defenses"—such as freedom of the press—"the grand jury need not determine whether probable cause has

been negated by a potential affirmative defense of the Defendants." *United States v. Clark*, 2011 WL 2015224, at *3 (D. Minn. Apr. 15, 2011) (Brisbois, J.). Thus, even if the Government did not discuss the First Amendment or Section 248(d)(1) before the grand jury (and we make no representation here about that matter), it was under no obligation to do so.

In essence, Defendants attempt to prematurely litigate a First Amendment defense. They assume what they set out to argue: that (notwithstanding the lack of a constitutional right to trespass) they were "attending the protest solely in their capacities as members of the press" and "were engaged in constitutionally protected conduct, including newsgathering, observing, recording, and reporting." (Mot. at 14.) Defendants may have the right to raise a First Amendment defense in a pre-trial motion to dismiss or to argue whether related facts preclude a finding of guilt at trial. But Defendants cannot properly obtain access to grand jury transcripts by making conclusory assertions that their untested First Amendment defense ultimately will prevail.

### 2. Defendants' Concerns About "Political Pressure" Are Misguided

Defendants insinuate that Government counsel made material misstatements to the grand jury because they were politically pressured to do so. Their primary "evidence" of political pressure is statements made by senior

administration officials, but, as discussed above, those accurately represent the relationship between the First Amendment and the charged statutory violations.  Nor do those statements provide any basis for assuming – much less finding – that Government counsel were subject to undue political pressure as opposed to simply having made their own independent assessments of the facts and the law.

Properly construed, the Attorney General's statement that "[w]e are coming after you if you participated" in the attack on Cities Church and Assistant Attorney General Dhillon's statement that "[w]e're gonna pursue this to the ends of the earth" (Mot. at 7) are mere promises to vigorously enforce federal criminal law.  These officials' immediate predecessors made similar pledges to prosecute what they considered high-profile violations of civil-rights statutes.[3]  Such reassurances to the American people that federal criminal law will be enforced are not irregular or inappropriate.  They also serve an

---

[3] *See, e.g.*, Attorney General Merrick B. Garland, *Statement before the United States Senate Appropriations Committee Subcommittee on Commerce, Justice, Science, and Related Agencies*, (Apr. 17, 2024) ("We have seen a sharp increase in threats against Jewish, Muslim, Arab, and Palestinian communities, and we are aggressively investigating and prosecuting such threats.  We will continue to do so."). Assistant Attorney General for Civil Rights Kristen Clarke, *Remarks at George Washington University's Equity Institute Initiative* (Sept. 23, 2022) ("[W]e will seek accountability for officers whose actions, or failure to intervene, violate the law.  Simply put, George Floyd and Breonna Taylor should be alive today."), https://tinyurl.com/3nevtdse.

important deterrent effect, which can help reduce similar illegal conduct and related injuries.

Defendants next criticize the Government's "highly unusual conduct" in prosecuting this case, namely, the involvement of the Civil Rights Division and the insufficient role of the local United States Attorney's Office. (Mot. at 8-9, 15.) Beyond the fact it is irrelevant, that tired canard is nonsense. Local prosecutors have been working on this case since prior to the indictment and are currently assigned to it even now. Moreover, since at least 1997, the Civil Rights Division has been responsible for enforcing the FACE Act. *See* United States Attorneys' Manual § 8-1.100(B) (1997); Justice Manual § 8-1.100(B) (last updated 2023). Under the Obama and Biden Administrations, prosecutors from the Civil Rights Division regularly enforced the Act against defendants accused of violating § 248(a)(1)'s protections of reproductive-health facilities.[4] So, there's nothing "highly unusual" about this prosecution.

Defendants' reliance on *United States v. Comey*, 809 F. Supp. 3d 396 (E.D. Va. 2025), is misplaced. (Mot. at 15; Bollman Mot. at 11.) In *Comey*, the court ordered the disclosure of grand-jury materials in large part because the grand jury returned "two facially inconsistent indictments." *Id.* at 410. The "short time span" between the two indictments was part of an "unusual series

---

[4] *E.g.*, *United States v. Zastrow*, No. 23-cr-20100 (E.D. Mich. Feb. 15, 2023); *United States v. Reynolds*, No. 16-cr-490 (D. Md. 2017).

of events" that "call[ed] into question the presumption of regularity associated with grand jury proceedings." *Id.* These concerns are absent here. The indictment and superseding indictment are consistent, and there is no basis for rebutting the presumption of regularity.

Defendants' remaining arguments about political pressure also fall flat. They cite two former prosecutors who claim that unidentified "recent actions by DOJ demonstrate that the DOJ is wrongfully using the grand jury as a tool in its campaign of retribution and intimidation" against unidentified individuals. (Mot. at 16.) Absent specific examples, these ambiguous polemics are unpersuasive.

Defendants argue that they are the victims of a politicized prosecution because two judges of this Court found no probable cause upon review of the complaint. (Mot. at 16.) But, as the Court knows, a grand jury presentation often differs from a complaint affidavit in terms of detail and comprehensiveness. Moreover, the Government is not barred from presenting a case to a grand jury simply because the Court had misgivings about the sufficiency of a complaint. As noted above, Circuit Judge Grasz found that "the Complaint and Affidavit clearly establish probable cause." *In re United States*, 2026 WL 185713, at \*1. The grand jury agreed. But there's a more basic point here that defendants ignore. Juries and grand juries are checks on the Courts

as well as the Government, and in that sense they protect the interests of the public as well as defendants.

Finally, because Defendants cannot identify a single public statement that the Government has made about Fort, they resort to arguing that her prosecution is politicized because the affidavit in support of its complaint "contained only two allegations regarding Ms. Fort's conduct." (Mot. at 17.) The length of a complaint affidavit has nothing to do with whether a prosecution is politicized and reveals nothing about the validity of the grand jury proceedings.

## B.     The Need for Secrecy Outweighs Defendants' Interest in Disclosure

Because Defendants have not established that the Government likely has acted improperly in prosecuting this case, they fail to show that their need for the grand jury transcripts is "greater than the need for continued secrecy." *McGougal*, 559 F.3d at 841. "[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of Cal. v. Petrol Stops N.W.*, 441 U.S. 211, 218 (1979). Because the publicization of grand jury proceedings would deter witnesses from testifying before grand juries, courts are "reluctant to lift unnecessarily the veil of secrecy from the grand jury," *id.* at 219, and "have consistently stood ready to defend it against unwarranted intrusion," *Sells Engineering*, 463 U.S. at 425.

Defendants point out that this is not "your run-of-the-mill case," but that is precisely why there is a heightened need for secrecy. Mot. 19. In a high-profile case such as this, disclosure of the transcripts could expose the witnesses who testified before the grand jury "to retribution as well as inducements." *Sells Engineering* 463 U.S. at 424. Moreover, this remains an open investigation, and disclosure of the proceedings to date could interfere with further proceedings before the grand jury.

Bollman separately argues that he is entitled to the grand-jury proceedings because he is "demonstrably innocent." (Bollman Mot. at 12.) A defendant's claims of innocence are insufficient to overcome the strong presumption of secrecy underlying grand-jury proceedings. Otherwise, a defendant would be entitled to such proceedings simply by pleading not guilty. The Government's dismissal of the charges against Heather Lewis does not alter the analysis. As explained in the contemporaneously filed Government's Response to Defense Motion for *Brady* Disclosure and Reconsideration of Discovery Schedule, the Government made no misrepresentations about Lewis or the number of defendants.

## II. The Government Is Entitled to the Presumption of Regularity

"[G]rand jury proceedings are afforded a strong presumption of regularity, and a defendant seeking to overcome that presumption faces a

heavy burden." *United States v. Fenner*, 600 F.3d 1014,1021 (8th Cir. 2010). Defendants have not met the heavy burden of overcoming that presumption.

As explained above, there is no "stunning and unremitting irregularity in this case." (Mot. at 20.) The Attorney General, Deputy Attorney General, and Assistant Attorney General for Civil Rights have not "engag[ed] in blatant politicization and name calling" (Mot. at 21), but have made accurate statements of law and addressed the comments to a matter of public concern.[5] There is nothing remarkable about the way in which the Government has staffed this case. Nothing about the Government's early procedural efforts evidence any impropriety. They reflect good faith efforts by the Government to enforce federal law for the benefit of all Americans, just as we trust the Court's review of the complaint affidavit reflect its good faith efforts to discharge its separate and equally important duties.

Lacking evidence of governmental misconduct in this case, Defendants resort to arguing that the Government is not entitled to the presumption of regularity in this case because district courts have ruled against the Government in unrelated cases. Defendants cite several cases in which courts

---

[5] Defendants are not entitled to the extraordinary remedy of releasing grand-jury materials simply because the President expressed his opinion about their conduct. Defendants also reference the "doctored" photo of a co-defendant posted by the "White House official social media account." (Mot. at 12 n.17.) The White House's social-media account does not speak for the Department of Justice.

in this district have held that Immigration and Customs Enforcement ("ICE") has violated court orders. (Mot. at 21-22; Bollman Mot. at 14.) The entire argument is invalid. "Government agencies do not merge into a monolith, at least not in the litigation context." *Ratsamy v. United States*, 2008 WL 919545, at \*2 (D. Minn. April 2, 2008). Thus, any alleged misconduct by ICE may not be imputed to the Department of Justice's prosecution of these offenses.

Further, *Federal Educational Association v. Trump*, 795 F. Supp. 3d 74 (D.D.C. 2025), does not support stripping the Government of its presumption of regularity. (*Contra* Mot. at 23.) That case had nothing to do with grand jurors but concerned labor unions' challenges to an executive order that removed certain federal agencies from the scope of collective-bargaining protections. The court held that the Government was not entitled to the presumption that the executive order was lawful because the Government's statements and guidance surrounding the executive order suggested that the order "was in furtherance of unrelated policy goals rather than based on the statutory criteria." *Fed. Educ. Ass'n*, 795 F.3d at 89. In short, the case is wholly inapt.

In the penultimate page of their motion, Defendants finally cite two cases that they claim "concluded that this Administration has lost entitlement to the presumption of regularity *in the context of grand jury proceedings*." (Mot. at 25.) Those cases say no such thing. *Comey* did not hold that the Government

lost the presumption of regularity. Instead, the court "call[ed] into question the presumption" based on a case-specific "unusual series of events" relating to the timing of a second indictment relative to the first indictment. 809 F. Supp. 3d at 410. In *United States v. Stewart*, 2025 WL 2754480, at *1 (D.D.C. 2025), the Court made no general findings about the presumption of regularity but focused instead on an issue not relevant here – *i.e.*, whether the Court had jurisdiction to accept an indictment returned by a local grand jury on federal charges alone. *Id.* at *2.

## III.   The Grand Jury Transcripts Should Be Reviewed *In Camera* Before Any Disclosure

At a minimum, if this Court concludes there is a risk that the Government made misstatements before the grand jury, it should review the transcripts *in camera* and not simply order them disclosed to Defendants. "*Ex parte in camera* hearings have been held proper to preserve the ongoing interest in grand jury secrecy." *In re Grand Jury Subpoenas, etc.*, 472 F.3d 990, 995 (8th Cir. 2007) (quoting *In re Grand Jury,* 103 F.3d 1140, 1145 (3d Cir. 1997)).

It bears noting, however, that although *in camera* review of grand jury materials might be warranted in certain instances of serious prosecutorial misconduct, Defendants have made no showing of any such circumstances

20

here.  *United States v. Finn*, 919 F. Supp. 1305, 1327 n.27 (D. Minn. 1995)

(declining in camera review on this ground).

## CONCLUSION

For all the foregoing reasons, Defendants have failed to establish any

particularized need for disclosure of the grand jury proceedings.  Accordingly,

the Court should deny both defense motions.

DATED: March 27, 2026.

DANIEL N. ROSEN
United States Attorney

FLAVIO DE ABREU
JOHN R. ARBOLEDA
Special Assistant United States
Attorneys

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General

ORLANDO B. SONZA
Counsel

JOSHUA R. ZUCKERMAN
Attorney


   */s/ Joshua R. Zuckerman*
Joshua R. Zuckerman
   Civil Rights Division
   U.S. Department of Justice
   950 Pennsylvania Ave. NW
   Washington, DC 20530
   Telephone: (202) 514-3847
   E-Mail: joshua.zuckerman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

21