UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 0:26-cr-025-LMP-DLM |
| | ) | |
| Plaintiff, | ) | **OPPOSITION TO** |
| | ) | **DEFENDANTS' MOTION** |
| v. | ) | **TO DISCLOSE GRAND** |
| | ) | **JURY PROCEEDINGS** |
| NEKIMA VALDEZ LEVY-ARMSTRONG, et al., | ) | **(*with Amended Signature Block*)** |
| | ) | |
| Defendants. | ) | |
| | ) | |

Thirty-three defendants have moved for the disclosure of grand jury materials. (Dkt. 491 ("Mot.")), and another has joined the motion (Dkt. 494). They primarily argue that disclosure is required because the superseding indictment "fail[s] to establish many of the statutory elements of the offenses." (Mot. 20.) This is a premature effort to litigate the merits of this case, and defendants cannot properly overcome the strong presumption of grand jury secrecy by arguing that the Government has failed to allege an offense. In support of their argument, defendants wrongly seek to foist heightened pleading requirements upon the Government based on the false premise that their offense "conduct involves core First Amendment expression" and the indictment "implicate[s] protected speech. (Mot. at 16, 18 n.7.)

However, defendants' claim runs counter to clearly established law, and the Court must not countenance that. As the Eighth Circuit held long ago,

> *"[Protestors] do not have a right to enter [a] cathedral and disrupt the church services of [other people]."*

*See Action v. Gannon*, 450 F.2d 1227, 1233 (8th Cir. 1971) (affirming injunction that barred activist organizations and their members from entering a church and disrupting religious services inside the church). "Such disruption is an intolerable violation of the rights of those engaged in worship." *Id.* at 1233 (citing *Gregory v. Chicago*, 394 U.S. 111, 124-25 (1969) (Black, J., concurring) ("The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy.")); *see also Phelps-Roper v. City of Manchester*, 697 F.3d 678, 695 (8th Cir. 2012) (en banc) (rejecting First Amendment challenge to city ordinance that restricted protests within 300 feet of a funeral or burial service while it is occurring and one hour before and after the service).[1]

Defendants' remaining arguments rely on rank speculation of prosecutorial misconduct and largely rehash the arguments already made by defendants Lemon, Fort, and Bollman in their previously-filed motions for disclosure of grand jury transcripts (Dkts. 125 ("Lemon Mot."), 441.)  In short,

---

[1]  The law of the State of Minnesota is in happy agreement with Eighth Circuit case law. *See, e.g.*, Minn. Stat. § 609.28 (prohibiting interference with religious observances).  Likewise, in its online guide for protestors, the ACLU captures the gist of the law on this point, noting that people have broad rights to protest in *public* on *public* property, but warning that "[p]rivate property owners can set rules for speech on their property."  *See* www.aclu.org/know-your-rights/protesters-rights (Jan. 30, 2026).

defendant simply assume that Government counsel's legal instructions to the grand jury mirrored officeholder statements to the public, which are themselves entirely proper but designed to serve a different and legitimate purpose — *i.e.*, deterrence and notice of the Government's awareness of a matter of public concern. Those arguments all lack merit for the reasons discussed herein and in the Government's Consolidated Opposition to Defense Motions for Disclosure of Grand Jury Transcripts (Dkt. 479), which the Government incorporates by this reference.

## BACKGROUND

### A. Offense Conduct

On January 17, 2026, defendant ARMSTRONG received text messages from a local news reporter advising her that a named Immigration and Customs Enforcement ("ICE") (who he referred to as "the local ICE overseer") "is a pastor at [Cities Church]," a fact that ARMSTRONG deemed "outrageous." (Dkt. 144 at 6.) Defendant ARMSTRONG immediately began making plans for a pre-operation briefing and takeover-style assault on the church. (*Id*. at 6-7.)

Later that day (January 17, 2026), defendants ALLEN and STRONG conducted reconnaissance around the Cities Church in preparation for the next day's operation at the Church and made a video documenting their observations, including the location of parking areas, where they could "pull

3

up," and ALLEN noted that "my thoughts are to be able to clog up this whole alleyway right here." (*Id*. at 7.) Defendant ALLEN sent her reconnaissance video via text message to defendant ARMSTRONG for her use in preparing for the takeover operation against the Church. (*Id*.) Defendants ARMSTRONG, ALLEN, and DOTY exchanged text messages regarding the contemplated operation against the Church, with one asking whether members of the Church would be able to see their approach to the building. (*Id*.)

On January 17, 2026, defendant ARMSTRONG prepared a flyer advertising an anti-ICE action dubbed "Operation PullUp" and telling fellow agitators where to meet to prepare for the operation, and exhorting them to "be ready to mobilize," and she posted the flyer on two Instagram accounts controlled by her, "@nekimal" and "@racialjusticemn." Multiple defendants posted that flyer on their respective internet accounts. (*Id*. at 8.) The flyer was also shared through more discreet means. (*Id*., Overt Act 12.)

On the morning of January 18, 2026, defendants, together with others, gathered for a pre-operation briefing at the parking lot of a shopping center in St Paul, MN. (*Id*. at 8-9.) During the pre-operation briefing, defendants ARMSTRONG and ALLEN advised other co-conspirators about the target of their operation (*i.e.*, Cities Church) and provided instruction on how the operation would be conducted once they arrived at the Church. (*Id*. at 9.) They made clear that the protest would involve entrance into the church in a

coordinated takeover-style attack. (*Id.* at 3, 10, 12.) Specifically, they explained that the group would go inside the church in two "waves" — with the first wave embedding itself in the audience and then joining in unison once the second wave entered the church to start the takeover-style protest. (*Id.* at 10-12.) They also made clear that the protest inside the church would involve loud disruptive chants, including, among others, that "This is what community looks like" and "ICE out of Minnesota." (*Id.* at 10.) ALLEN exhorted her co-conspirators that they have a "duty to fight for our freedom" and "a duty to win." (*Id.*)

Upon defendants' arrival at the church, the operation proceeded as they had planned. (*Id.* at 11-12.) As the pastor was beginning his sermon, defendant ARMSTRONG walked down a side aisle with other defendants and interrupted the service with loud declarations about the Church harboring a "Director of ICE" and indicating that the time for "Judgment" had come. (*Id.* at 12.) Other defendants immediately joined in by yelling and blowing whistles, all of which quickly caused the situation in the Church to become chaotic, menacing, and traumatizing to Church members. (*Id.*) They joined together in various chants, some of which included "ICE Out!," "Hands Up, Don't Shoot!," and "Stand Up, Fight Back!" (*Id.*) Other chants proclaimed that the targeted ICE agent must be "Out! Out!," punctuated by the defendants punching their fists in the air. (*Id.* at 12-13.)

5

The chanting and other disruptive behavior were accompanied by hostile and aggressive gestures, which Church congregants and staff reasonably (and foreseeably) perceived as threats of violence and a potential prelude to a mass shooting. (*Id.* at 12-16.) And that reaction was not only intended but reasonably foreseeable — *e.g.*, the references to a shooting (with the August 2025 shooting at Annunciation Catholic School in Minneapolis still a fresh memory); orders to put their "hands up," like robbers and kidnappers are inclined to do to their victims; claims that the defendants were there at the church to deliver Judgment, a concept which is generally associated with final punishment for wrongdoers and is especially frightening when flawed mortals imagine it is their role to deliver such Judgment; etc.

While inside the church, defendants — acting *en masse* —"physically occup[ied] most of the main aisle … and/or physical[ly] obstructed [congregants] as they attempted to exit and/or move about within the Church." (*Id.* at 13.) The defendants blocked aisles and rows within the audience section and physically confronted many congregants. (*Id.* at 13-16.) Some defendants "blocked the stairs leading to the Church's childcare and made it difficult and hazardous for parents to retrieve their children, causing some to take alternative routes in or around the Church." (*Id.* at 16.)

Because of this attack, the pastor and congregants were forced to end their worship service. (*Id.*) Several congregants fled the Church, fearing a

mass shooting. (*Id.* at 12.) In the rush to escape, one congregant slipped and fell and suffered a bodily injury. (*Id.* at 2, 12, and 18.) Other congregants took steps to implement an emergency plan, and young children were left to wonder, as one child put it, if their parents were going to die. (*Id.* at 3.) As defendant LEMON acknowledged during the offense conduct, he saw one "young man" who was "frightened," "scared," and "crying." (*Id.* at 14.)

The obstructive conduct within the church and the disruption of the church service were the intended and natural and probable consequences of the conspiracy. As LEMON acknowledged, the congregants' reactions were understandable because the experience was "traumatic and uncomfortable," which he said was the purpose. (*Id.* at 14.) He also tacitly acknowledged the illegal nature of the protest by expressing surprise that the police had not yet arrived at the Church and admitting his knowledge that "the whole point of [the operation] is to disrupt." (*Id.*)

While inside the church, defendants engaged in a chant proclaiming, "Who shut this down? We shut this down!" (*Id.* at 15.)

## B.    Procedural History

In late January 2026, a federal grand jury issued an indictment against the first nine defendants. In February 2026, the grand jury issued a superseding indictment charging an additional 30 defendants. (Dkt. 144.) All of the defendants are charged with the same two charges: (1) Conspiracy

Against Federally Secured Rights, in violation of 18 U.S.C. § 241; and (2) Interference with the Free Exercise of Religion at a Place of Religious Worship, in violation of 18 U.S.C. § 248(a)(2).

Defendants Lemon, Fort, and Bollman moved for disclosure of the grand jury transcripts. (Dkts. 125 ("Lemon Mot."), 441.) Citing public statements by the President, Attorney General, Deputy Attorney General, and Assistant Attorney General for the Civil Rights Division—as well as the procedural history of this case—they argued that the Government was motivated by "political pressure" and "went to extraordinary and unprecedented measures to obtain a complaint against Mr. Lemon and Ms. Fort." (Lemon Mot. at 15, 17.) The United States filed its opposition (Dkt. 479), and the motions are pending before the Court.

In the subject motion, thirty-four additional defendants are also moving for disclosure of grand jury proceedings. (Dkt. 491 ("Mot."), Dkt. 494 (joinder).) They argue disclosure is necessary based on speculation that the Government's counsel misadvised the grand jury about the applicable law, and they suspect (based solely on public statements of other public officeholders) that counsel may also have engaged in inflammatory rhetoric while presenting the indictments.

## ARGUMENT

## I.    Grand Jury Proceedings Are Protected By Well-Established Rule of Secrecy

The veil of secrecy that protects grand jury proceedings is well-established, as is the legal justification for such secrecy. *See Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979) ("We consistently have recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings."). This is so even when the grand jury has concluded its operations, "[f]or in considering the effects of disclosure on grand jury proceedings, the courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries." *Id.* at 222.

Federal Rule of Criminal Procedure 6(e) "codifies the traditional rule of grand jury secrecy." *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 425 (1983). The Rule forbids disclosure of grand jury transcripts unless specific and very narrow exceptions apply. *Id.* Defendants attempt to invoke just one of these exceptions: Rule 6(e)(3)(ii), which allows a court to order disclosure of grand jury transcripts "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).

9

Because "[t]here is a strong presumption of regularity in grand jury proceedings," "defendant[s] [have] a heavy burden in proving irregularities." *See United States v. McKie*, 831 F.2d 819, 821 (8th Cir. 1987); *United States v. Kouba*, 822 F.2d 768, 774 (8th Cir. 1987) (same); *United States v. Hintzman*, 806 F.2d 840, 843 (8th Cir. 1986) (same).

Thus, a defendant moving for disclosure under Rule 6(e)(3)(E)(ii) must make "a showing of particularized need for grand jury materials before disclosure becomes appropriate." *United States v. McDougal*, 559 F.3d 837, 840 (8th Cir. 2009). "In order to demonstrate a particularized need" a party must show that the request for disclosure is "(1) required to avoid possible injustice in a different judicial proceeding, (2) greater than the need for continued secrecy, and (3) specifically directed at the material required." *McDougal*, 559 F.3d at 840 (cleaned up). Defendants fail to make the required showings.

## II.   The Court Should Not Order Disclosure of Grand Jury Materials

### A.   Disclosure of the Grand Jury Transcripts is Not Required to Avoid Injustice

Defendants argue that because of supposed "irregularities" in these proceedings, "justice demands that [they] be allowed to pierce the veil of grand jury secrecy." Mot. 10-11. They identify two categories of "irregularities" that purportedly give "reason to believe that the Government provided the grand

10

jury with fundamentally flawed legal instruction." Mot. 9 (capitalization altered). First, they claim that the superseding indictment "reflect[s] the Government's legal misconceptions." Mot. 20 (capitalization altered). Second, they accuse high-ranking officials of making "improper, inflammatory public statements." Mot. 27. Neither supposed "irregularity" allows defendants to overcome "the indispensable secrecy of grand jury proceedings." *United States v. Johnson,* 319 U.S. 503, 513 (1943).

> **1.     Defendants' Disagreement with the Government's Legal Theories Does Not Justify Disclosure of Grand Jury Materials**

Defendants primarily assert that they are entitled to grand-jury materials because the Government may have "provided fundamentally inaccurate legal instructions to the jury." Mot. 9. They claim there is a "disconnect between the statutory elements and the factual allegations" in the superseding indictment, which "demonstrates a high likelihood that the grand jury was misled." Mot. 20. Stated differently, defendants believe that the indictment is legally insufficient and that any instructions that prosecutors gave to the grand jury mirror the insufficiencies in the indictment. However, as noted above, defendants' argument relies on nothing more than speculation and cannot *properly* justify release of the grand jury transcripts.

*First*, the Government's utilization of Sections 241 and 248 in this case are not improper or extraordinary. Indeed, as with the original indictment, the allegations of the superseding indictment largely quote and track the elements set forth in the statutory language. *See* 18 U.S.C. §§ 241 and 248(a)(2). The counts also track the Government's approach to charging FACE Act violations involving pro-life protests at abortion clinics. Thus, the Government submits that the superseding indictment alleges all of the required statutory elements. Nor is the Government's use of Sections 241 and 248(a)(2) without any judicial support. In a concurring opinion issued in connection with the mandamus proceedings in this case, one Circuit Judge expressed the view that "the Complaint and Affidavit clearly establish[ed] probable cause for all five arrest warrants." *See In re United States*, 2026 WL 185713, at *1 (8th Cir. Jan. 23, 2026) (Grasz, J., concurring). The superseding indictment contains many of the same facts set forth in the complaint affidavit, as well as other facts.

Relying on out-of-circuit cases, defendants' motion relies on rank speculation that the Government "provided the grand jury with fundamentally flawed legal instructions," and they further speculate that the contents of the transcripts may "provide … grounds for a motion to dismiss." (Mot. 1, 9-10 (capitalization altered).) However, "[u]nder the prevailing law of this Circuit, the prosecutor is not under an obligation to provide the Grand Jury with any

legal instructions." *United States v. Finn*, 919 F. Supp. 1305, 1327 (D. Minn. 1995). Thus, a "challenge to an instruction to the Grand Jury is not a proper basis for the dismissal of an Indictment that is valid on its face." *Id.*

Another district court in this Circuit has explained that transcripts are "of no assistance" in a motion to dismiss. *United States v. Glenn*, 2015 WL 5496120, at *5 (D. S.Dak. 2015). In *Glenn*, defendants sought grand jury transcripts "to determine whether grounds may exist to dismiss the indictment based on what the grand jury was or was not told regarding the [charged statute's] *mens rea* requirement, scope, and definitions." *Id.* at *4. The court denied the motion, explaining that the transcripts would be of no marginal benefit to the defendant. "[I]f the indictment is insufficient because it lacks an essential element of the offense, it is immaterial what the grand jury was told as the insufficiency would be evident from the face of the indictment." *Id.* at *5.

The same is true here. Defendants go on at length about the imagined flaws in the superseding indictment which (they claim) supposedly necessitates dismissal (Mot. 13-27), only to bury in a footnote that their motion to dismiss is "likely forthcoming." (Mot. 20 n.8.) If the superseding indictment "simply do[es] not come close" to alleging a conspiracy under Section 241 and "reflects the government's basic misunderstanding of the legal requirements of § 248," as defendants claim (Mot. 22-23), then the Court can assess any such

13

deficiency upon review of the contemplated motion to dismiss. That motion can be evaluated without any need for the Court to consider the accuracy of any instructions given to the grand jury. Thus, defendants' pending motion simply fails, as a matter of law, to establish any legally valid need for disclosure of the grand jury transcripts.

Some out-of-circuit cases suggest that a flawed instruction to a grand jury can require dismissal of an indictment. (*See* Mot. 10.) Even if that were true in this Circuit, the instruction would have to be so grossly erroneous that it amounts to overt prosecutorial misconduct. "Where a defendant alleges prosecutorial misconduct" before a grand jury, dismissal of the indictment "is proper only when the defendant demonstrates *flagrant misconduct* and *substantial prejudice.*" *United States v. Darden*, 688 F.3d 382, 387 (8th Cir. 2012) (emphasis added). Again, however, defendants offer nothing more than speculation to suggest that the grand jury must have been misadvised.

Defendants' views regarding the sufficiency of the indictment's allegations hardly amount to "flagrant misconduct," such as "introduc[ing] evidence that [the prosecutor] knows to be perjured." *United States v. Lame*, 716 F.2d 515, 518 (8th Cir. 1983). Under applicable law, those disagreements can be addressed in a motion to dismiss. They are clearly insufficient to carry defendants' "heavy burden" of showing that a fundamental defect must have infected the grand jury process. *McKie*, 831 F.2d at 821.

***Second***, defendants' motion is clearly invalid to the extent it is being used as a vehicle to challenge the sufficiency of the superseding indictment's factual allegations. "It is well established that an indictment returned by a legally constituted and unbiased grand jury 'is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence.'" *United States v. Vincent*, 901 F.2d 97, 99 (8th Cir. 1990) (quoting *United States v. Calandra*, 414 U.S. 338, 345 (1974)). Moreover, contrary to the suggestion in defendants' motion, it is well-settled that an indictment, in order to be sufficient, need not anticipate affirmative defenses. *United States v. Sisson*, 399 U.S. 267, 288 (1970).

Thus, defendants' efforts to challenge the sufficiency of the evidence — *e.g.*, insisting that "the evidence is extraordinarily thin" and that the superseding indictment's "factual allegations" simply "do not come close to describing an agreement to injure, intimidate[,] or interfere with any person" in violation of Section 241 (Mot. 16, 22) — provide no independent support for their motion to disclose the grand jury proceedings. That is also true with defendants' "entirely conclusory" argument that the indictment's allegations do not "describe conduct that comes anywhere close to the kind of physical obstruction" under Section 248. (Mot. 24-25, 26.)

Such arguments are not even viable bases for a motion to dismiss, but they fall especially short as a basis to unseal the grand jury proceedings in this

15

case. Likewise, questions about "narrow, complex statutes" (Mot. 9) are not appropriate for resolution in the context of a motion for grand jury materials.

As discussed above, a criminal defendant may not obtain grand jury transcripts simply because he disagrees with the legal theories reflected in the indictment. *See Glenn*, 2015 WL 5496120, at *5. Otherwise, courts would have to rule on the merits of a hypothetical, unbriefed motion to dismiss whenever a defendant seeks a grand jury transcript due to allegedly "flawed instructions." Such an absurd rule would destroy grand jury secrecy, without any support under Rule 6.

***Third***, defendants' attempt to invoke extra pleading requirements by claiming that their "conduct involves core First Amendment expression" (Mot. 16) is without merit. As explained above, *protestors "do not have a right to enter [a] cathedral and disrupt the church services of [other people]." See Action*, 450 F.2d at 1233 (affirming injunction that barred activist organizations and their members from entering a church and disrupting religious services inside the church); *Gregory*, 394 U.S. at 124-25 (Black, J., concurring); *Phelps-Roper*, 697 F.3d at 695 (rejecting First Amendment challenge to city ordinance that restricted protests within 300 feet of a funeral or burial service while it is occurring and one hour before and after the service). Thus, the Government's indictments in this case are not subject to any special pleading requirements.

*Fourth*, defendants' motion is invalid because it simply assumes the truth of what defendants set out to argue: that their defenses will prevail. They devote much of their motion (Mot. 13-27) attempting to buttress their defense claims, but their arguments are flawed.  For example, their argument that they did not engage in "physical obstruction" because they did not "render all doorways impassable or make entering or exiting the building unreasonably hazardous" (Mot. 25) is invalid because "physical obstruction" " "encompass[es] conduct such as …  confronting [people] at close range," *New York v. Griepp*, 991 F.3d 81, 104 (2d Cir. 2021), and whether the obstruction was successful is "beside the point," *New York v. Rescue*, 705 F. Supp. 3d 104, 124 (S.D.N.Y. 2023).  Likewise, their claim that the superseding indictment is "conclusory" (Mot. 23-24) is invalid because an indictment is "sufficient" if it "set[s] forth the offense in the words of the statute itself."  *Hamling v. United States*, 418 U.S. 87, 118 (1974).

The other legal theories floated in defendants' pending motion are untested, and as the above discussion previews, highly dubious.[2]  Even

---

[2]  The Government has not responded here to certain other claimed weaknesses mentioned in defendants' motion, because they are no more valid as bases for the pending motion — which seeks disclosure of the grand jury transcripts.  As noted above, defendants' interpretations of Sections 241 and 248 are incorrect, and the Government will rebut them at the appropriate time. The Government reserves all rights and does not waive any challenges to defendants' arguments.

accepting the false premise that defendants were somehow entitled to grand jury transcripts because the indictment is deficient, the instant motion should be denied because it fails to carry the "heavy burden" of showing a gross irregularity in the grand jury proceedings.

### 2. Defendants' Concerns About Public Statements by High-Ranking Officials are Misguided

Defendants rehash Lemon, Fort, and Bollman's argument that various public statements made by then-Attorney General Pam Bondi and Assistant Attorney General Harmeet Dhillon necessitate disclosure of the grand jury transcripts. (Mot. 27-29; *see also* Lemon Mot. at 6-8, 12-13.) The Government previously explained that the challenged statements are either *correct* statements of law or routine promises to vigorously enforce federal criminal law. (Dkt. 479 at 7-9, 12-13.) For example, Assistant Attorney General Dhillon publicly explained that a "house of worship is not a public forum for [a] protest." (Mot. 28.) This statement did not, as defendants argue, "suggest that the First Amendment's protection of free speech does not apply in a church." *Id.* Rather, her remarks are entirely consistent with Eighth Circuit precedent: the First Amendment does not confer a "right to enter [a] cathedral and disrupt the church services of [other people]." *Action*, 450 F.2d at 1233.

Defendants claim that they are entitled to grand jury transcripts because "DOJ officials framed this prosecution essentially as a holy war against a group

of infidels who attacked Christianity itself." (Mot. 27.) The argument is utterly groundless invective. The superseding indictment contains no allegations about any defendant's religious belief or lack thereof. And defendants do not identify any comments made by DOJ officials that address any defendant's religious belief or lack thereof. Then-Attorney General Bondi's pledge that the "Department of Justice STANDS for Christians and Americans of all faith," (Mot. 28), is an appropriate promise that the United States will protect both members of a specific faith recently victimized in a high-profile attack, as well as the religious rights of all Americans. It is no more radical than the promises contained in 18 U.S.C. §§ 248 and 247, as well as the First Amendment. Likewise, Assistant Attorney General Dhillon's remark that Defendants "interfere[d] with Christian worshippers" (Mot. 28) is an accurate description of some allegations in the superseding indictment and does not insinuate that anyone is an "infidel." The Department of Justice routinely issues similar statements in response to attacks on houses of worship or religiously motivated hate crimes.[3]

---

[3] *See* Attorney General Merrick B. Garland, *Remarks at the 30th Annual Federal Inter-Agency Holocaust Remembrance Program* (Jan. 13, 2022) ("The Justice Department knows that we have an obligation … to hold individuals accountable for crimes driven by antisemitism and by all forms of hatred."), https://tinyurl.com/3t3d3jhy; DOJ Office of Public Affairs, *Ohio Man Sentenced to 18 Years in Prison for Firebombing a Church that Planned to Host Drag Show Events* (Jan. 30, 2024) ("'[T]his type of hate-fueled attack against a church will not be tolerated in our country,' said Assistant Attorney General

Defendants further raise the conclusory argument that DOJ officials have violated "federal regulations, their own Justice Manual, and the Rules of Professional Conduct," thereby requiring release of the grand-jury transcripts. (Mot. 29; *see also id.* at 8.)  They are incorrect.  28 C.F.R. 50.2(b) is inapplicable because it "app[lies] to the release of *information* to news media," not to threats of enforcement or general statements about the scope of the First Amendment. 20 C.F.R. 50.2(b)(1) (emphasis added).  Section 1-7.600 of the Justice Manual and Minnesota Rule of Professional Conduct 3.6 prohibit statements that may have a "substantial likelihood of materially prejudicing an adjudicative proceeding."[4]  Defendants do not explain how any remarks made by DOJ officials, even if "inflammatory," were materially prejudicial.  Mot. 28.

Defendants also argue that they are entitled to the grand jury transcripts because there is a "nonspeculative risk that prosecutors … used their supervisors' inflammatory language to characterize events; expressed personal opinions about the protesters or the charges; and/or rushed the grand jury to indict."  Mot. 30.  This argument does little more than repackage

---

Kristen Clarke of the Justice Department's Civil Rights Division."), https://tinyurl.com/2j8rmscv.

[4]  Defendants cite the American Bar Association's Model Rule of Professional Conduct 3.6,  Mot. 8, which do not bind any attorney, much less the Government.  Minnesota Rule of Professional Conduct 3.6 uses identical language and is applicable per Local Rule 83.6(a).

Defendants' complaints about the proper public statements made by then-Attorney General Bondi and Assistant Attorney General Dhillon. (*See supra.*) Also, as Defendants appear to recognize in suggesting that the prosecutors who appeared before the grand jury were "*perhaps* pressured by [their] supervisors" to act inappropriately, this argument is entirely speculative. *Id.* (emphasis added); *see also* Lemon Mot. 1 ("To date, everything in this case has been irregular; we can *assume* the grand jury proceedings were too.") (emphasis added). Such "speculative allegations of misconduct do not meet the particularized need standard" for obtaining grand-jury materials. *United States v. Naegle*, 474 F. Supp. 2d 9, 10 (D.D.C. 2007).

Defendants overlook the critical distinction between Senate-confirmed officials communicating with the public and line prosecutors appearing before a grand jury. As the Government has explained, high-ranking officials need to "communicate to the public that the Department of Justice takes the concerns of all faith-based communities seriously and that it will seek to protect the First Amendment right of religious freedom within houses of worship." (Dkt. 479 at 9.) In doing so, they often use informal language or make policy statements that, while appropriate for speaking to mass audiences, would not be appropriate in the entirely different context of grand-jury proceedings. Defendants accordingly provide no non-speculative reason to believe that the

21

line prosecutors made comments to the grand jury that mirror "their supervisors' inflammatory language." (Mot. 30.)

Additionally, Defendants' claim that the Government "attempt[ed] to bully federal courts to approve charges" has no basis in law or fact and therefore does not justify the release of grand jury materials. Mot. 30. Defendants fail to identify any specific conduct that "bullied" courts, but they presumably are referring to the Government's attempt to seek a writ of mandamus regarding the district court's decision not to issue arrest warrants for certain defendants to the Eighth Circuit. An effort to seek mandamus relief from a higher court is explicitly authorized by federal law, 28 U.S.C. § 1651, and is not an attempt to "bully" a lower court. In any event, the existence of a mandamus petition does not create a plausible inference prosecutors attempted to "bully" or "rush" grand jurors. Mot. 30-31.

## B.   The Need for Secrecy Outweighs Defendants' Interest in Disclosure

Any transcripts reflecting legal errors in instructions given to the grand jury would be of no use to defendants (*see supra*), and defendants cannot establish that the Government prosecutorial misconduct based on a handful of accurate statements by high-ranking officials. (*See* Dkt. 471 at 16-17.) Defendants therefore fail to show a compelling need for the grand jury materials.

22

In contrast, there is considerable need for secrecy. "[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil*, 441 U.S. at 218. The publicization of grand jury proceedings would deter witnesses from testifying before grand juries, so courts are "reluctant to lift unnecessarily the veil of secrecy from the grand jury," *id.* at 219, and "have consistently stood ready to defend it against unwarranted intrusion." *Sells Engineering*, 463 U.S. at 425. Moreover, in a case such as this which has received some publicity, disclosure of the transcripts could expose the witnesses who testified before the grand jury "to retribution as well as inducements." *Id.* at 424. Thus, defendants' need for grand jury materials is not "greater than the need for continued secrecy." *McGougal*, 559 F.3d at 841.

Defendants' arguments to the contrary are unpersuasive. They argue that "release of the requested information … might deter future grand jury abuses by the government." (Mot. 35.) That generic interest is present in all cases. So is their asserted need to "assert a constitutional challenge … if there is a nonspeculative chance that the government engaged in misconduct sufficient to interfere with the independence of the grand jury." (*Id.*) Again, that purported need rests on the false premise that the Government likely "provided numerous radically incorrect legal instructions" to the grand jury and that a transcript thereof would help secure dismissal.

23

Finally, and most importantly, the Government's investigation remains ongoing. It is not done. As noted in one prior filing, the Government recently identified another co-conspirator. Moreover, suffice it to say that the U.S. Criminal Code contains other sections that are available for use in prosecuting conduct of the type alleged in this case. *See* 18 U.S.C. §§ 372 (Conspiracy to Intimidate Federal Officer from Discharging Duties) and 247(a)(2) (Obstruction of Religious Services).

## C.    Defendants' Request Is Not Narrowly Tailored

Defendants seek a "transcript of direct interactions between the prosecution and the grand jury," the "[t]estimony of federal law enforcement witnesses," and "[g]rand jury exhibits." (Mot. 33-34 (emphasis omitted).) That is not "specifically directed at the material required." *McDougal*, 559 F.3d at 840. Indeed, defendants' motion is nothing more than a fishing trip.

Defendants argue that the Government may have provided misleading grand jury instructions and made inflammatory remarks. At the very most, their argument is "specifically directed" at the transcripts and any exhibits containing legal instructions. They have not demonstrated, or even attempted to demonstrate, any particularized need whatsoever for witness testimony or exhibits unrelated to legal instructions.

III. **The Grand Jury Transcripts Should Be Reviewed *In Camera* Before Any Disclosure**

As the Government previously argued (Dkt. 479 at 20-21), if this Court concludes there is a risk that the Government made misstatements before the grand jury, it should review the transcripts *in camera* before turning them over to Defendants. "*Ex parte in camera* hearings have been held proper to preserve the ongoing interest in grand jury secrecy." *In re Grand Jury Subpoenas, etc.*, 472 F.3d 990, 995 (8th Cir. 2007).

It bears noting, however, that although *in camera* review of grand jury materials might be warranted in certain instances of serious prosecutorial misconduct, defendants have made no showing of any such circumstances here. For that reason, the Court should decline to conduct an *in camera* review as a matter of course. *See, e.g., United States v. Finn*, 919 F. Supp. 1305, 1327 n.27 (D. Minn. 1995) (declining in camera review on this ground).

## CONCLUSION

For all the foregoing reasons, the Court should deny defendants' motion for disclosure of the grand jury proceedings.

DATED: May 1, 2026.                  Respectfully submitted,

DANIEL N. ROSEN                      HARMEET K. DHILLON
United States Attorney               Assistant Attorney General

FLAVIO DE ABREU                      ROBERT J. KEENAN
Special Assistant United             Acting Deputy Assistant Attorney
States Attorney                      General

                                     ORLANDO B. SONZA
                                     Counsel

                                     MEGAN FREDERICK
                                     GRETA GIESEKE
                                     NEVILLE S. HEDLEY
                                     KELSEY E. MCGEE
                                     JOSHUA R. ZUCKERMAN
                                     Attorneys

                                       */s/ Robert J. Keenan*
                                       Civil Rights Division
                                       U.S. Department of Justice
                                       950 Pennsylvania Ave. NW
                                       Washington, DC 20530
                                       Telephone: (202) 305-2566
                                       E-Mail:  robert.keenan@usdoj.gov

                                     Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA

26