UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>[4] Don Renaldo Lemon, and<br><br>[8] Georgia Ellyse Fort,<br><br>Defendants. | Case No. 0:26-cr-00025 |

**PROPOSED BRIEF OF REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS AND 45 NEWS AND MEDIA ORGANIZATIONS AS
AMICI CURIAE IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS
SUPERSEDING INDICTMENT UNDER THE FIRST AMENDMENT**

Mark Anfinson
Minn. Bar No. 2744
Uptown Professional Building
3109 Hennepin Avenue South
Minneapolis, MN 55408
Phone: 612-827-5611
Facsimile: 612-827-3564
mranfinsonlaw@gmail.com

Bruce D. Brown
Lisa Zycherman
Gabe Rottman
Marietta Catsambas
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020 Washington,
DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
bruce.brown@rcfp.org

*Counsel for Amicus Curiae
Reporters Committee for Freedom of the Press*

## CORPORATE DISCLOSURE STATEMENTS

Advance Publications, Inc. ("Advance") certifies that it has no parent corporation and no publicly held corporation owns any of its stock.

The Associated Press is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law.  It is not publicly traded.

The Atlantic Monthly Group LLC is a privately-held media company, owned by Emerson Collective and Atlantic Media, Inc.  No publicly held corporation owns 10% or more of its stock.

Boston Globe Media Partners, LLC, is a privately held company.  No publicly held corporation owns 10% or more of its stock.

The Center for Investigative Reporting, Inc. is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code.  It has no statutory members and no stock.

Dow Jones & Company, Inc. ("Dow Jones") is an indirect subsidiary of News Corporation, a publicly held company.  Ruby Newco, LLC, an indirect subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones.  News Preferred Holdings, Inc., a subsidiary of News Corporation, is the direct parent of Ruby Newco, LLC.  No publicly traded corporation currently owns ten percent or more of the stock of Dow Jones.

First Amendment Coalition is a nonprofit organization with no parent company.  It issues no stock and does not own any of the party's or amicus' stock.

Free Press is a 501(c)(3) organization with no parent corporation and no stock.

The Institute for Nonprofit News is a 501(c)(3) non-stock corporation with no parent corporation.

The Inter American Press Association (IAPA) is a not-for-profit organization with no corporate owners.

The Intercept Media, Inc., publisher of The Intercept, is a non-profit non-stock corporation.  It has no parent, subsidiaries, or affiliates.

Investigative Studios, Inc. is a nonprofit corporation formally affiliated with the University of California, Berkeley.  It has no statutory members and no stock.

The Knight First Amendment Institute is a nonprofit organization.  It does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.

The McClatchy Company, LLC is privately owned by certain funds affiliated with Chatham Asset Management, LLC and does not have publicly traded stocks.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

The Media Law Resource Center has no parent corporation and issues no stock.

MediaNews Group Inc. is a privately held company.  No publicly-held company owns ten percent or more of its equity interests.

The Minnesota Newspaper Association has no parent corporation and issues no stock.

The Minnesota Reformer is an independent nonprofit news organization that is part of States Newsroom, the nation's largest state-focused nonprofit news organization.

MinnPost is an independent nonpartisan 501(c)(3).

MS NOW Cable, LLC ("MS NOW"), previously MSNBC, is a subsidiary of Versant Media Group, Inc., a publicly traded company.

The National Freedom of Information Coalition is a nonprofit organization that has not issued any shares or debt securities to the public, and has no parent companies, subsidiaries, or affiliates that have issued any shares or debt securities to the public

iii

National Newspaper Association is a non-stock nonprofit Florida corporation. It has no parent corporation and no subsidiaries.

The National Press Club Journalism Institute is a not-for-profit corporation that has no parent company and issues no stock.

The National Press Club is a not-for-profit corporation that has no parent company and issues no stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

New England First Amendment Coalition has no parent corporation and no stock.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

Newsday LLC is a Delaware limited liability company whose members are Tillandsia Media Holdings LLC and Newsday Holdings LLC. Newsday Holdings LLC is an indirect subsidiary of Cablevision Systems Corporation. Cablevision Systems Corporation is (a) directly owned by Altice USA, Inc., a Delaware corporation which is publicly traded on the New York Stock Exchange and (b) indirectly owned by Altice N.V., a Netherlands public company.

The News Guild-CWA is an unincorporated association. It has no parent and issues no stock.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Informed California Foundation, d/b/a Open Vallejo, is a California nonprofit corporation and an educational public charity organized pursuant to section 501(c)(3) of the U.S. Code. It has no parent corporation and issues no stock.

PEN American Center, Inc. has no parent or affiliate corporation.

Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

The Seattle Times Company: The McClatchy Company, LLC owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company.

Slate is part of The Slate Group, a wholly owned subsidiary of Graham Holding Company.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization. It has no parent corporation and issues no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

The St. Paul Pioneer Press is owned by MediaNews Group, a privately held company.

Student Press Law Center is a 501(c)(3) not-for-profit corporation that has no parent and issues no stock.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

Lupa Systems LLC is the parent company of Vox Media Group, LLC. No publicly held corporation owns 10% or more of the stock of Lupa Systems LLC.

Vox Media Holdings, Inc. is the parent corporation of Vox Media, LLC. Ten percent or more of the stock of Vox Media Holdings, Inc. is owned by Versant Media Holdings, Inc., which is publicly traded.

WP Company LLC d/b/a The Washington Post is a wholly-owned subsidiary of Nash Holdings LLC, a holding company owned by Jeffrey P. Bezos. WP Company LLC and Nash Holdings LLC are both privately held companies with no securities in the hands of the public.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENTS ....................................................... ii

TABLE OF CONTENTS .................................................................................. vii

TABLE OF AUTHORITIES ........................................................................... viii

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ................................ 1

INTRODUCTION .......................................................................................... 4

ARGUMENT ................................................................................................ 6

I.  Journalists intending to cover a story lack the specific intent to deprive individuals of a clearly defined right under FACE and Section 241 and therefore cannot be held criminally liable. ................................................................................ 6

    A. Public order laws must be tailored to protect against infringement of First Amendment activity. ............................................................................. 6

    B. The limiting principle of Section 241 is the high mens rea requirement. ........................ 8

II. If the Court allows the government's case to move forward, the FACE Act and Section 241  could be used to target journalists asking questions in public spaces, rendering the statutes unconstitutionally vague and overbroad. ................................. 13

    A. Public officials have sought to deploy broadly worded laws to treat newsgathering as criminal activity. ................................................................................. 14

    B. The government's case against the journalists risks additional interpretations of the statutes that would further criminalize protected journalistic activity, including interviewing witnesses in public. .................................................... 16

CONCLUSION ........................................................................................... 18

ADDENDUM: STATEMENTS OF INTEREST OF AMICI CURIAE ............................... 20

# TABLE OF AUTHORITIES

**Page(s):**

**Cases**

*Bray v. Alexandria Women's Health Clinic,*
     506 U.S. 263 (1993)................................................................................... 11, 13

*Chestnut v. Wallace,*
     947 F.3d 1085 (8th Cir. 2020) ........................................................................ 16

*Citizens United v. FEC,*
     558 U.S. 310 (2010)....................................................................................... 13

*City of Houston v. Hill,*
     482 U.S. 451 (1987)....................................................................................... 17

*Daily Herald Co. v. Munro,*
     838 F.2d 380 (9th Cir. 1988) .......................................................................... 13

*Democratic Nat'l Comm. v. Russian Fed'n,*
     392 F. Supp. 3d 410 (S.D.N.Y. 2019)............................................................. 13

*Garcia v. Cnty. of Alameda,*
     150 F.4th 1224 (9th Cir. 2025) ....................................................................... 16

*Goyette v. City of Minneapolis,*
     338 F.R.D. 109 (D. Minn. 2021)....................................................................... 8

*Gregory v. City of Chicago,*
     394 U.S. 111 (1969)......................................................................................... 7

*In re Express News-Corp.,*
     695 F.2d 807 (5th Cir. 1982) .......................................................................... 13

*Index Newspapers LLC v. U.S. Marshals Serv.,*
     977 F.3d 817 (9th Cir. 2020) ............................................................................ 8

*Morrison v. Olson,*
     487 U.S. 654 (1988)....................................................................................... 14

*NAACP v. Claiborne Hardware Co.,*
     458 U.S. 886 (1982)......................................................................................... 6

*New York State Nat. Org. for Women v. Terry,*
     159 F.3d 86 (2d Cir. 1998)............................................................................. 11

*Norton v. Ashcroft,*
   298 F.3d 547 (6th Cir. 2002) ............................................................ 12

*Quraishi v. St. Charles Cnty.,*
   986 F.3d 831 (8th Cir. 2021) ............................................................ 16

*Screws v. United States,*
   325 U.S. 91 (1945)............................................................... 9, 12

*Smith v. Daily Mail Publ'g Co.,*
   443 U.S. 97 (1979)............................................................... 13

*Thornhill v. Alabama,*
   310 U.S. 88 (1940) ............................................................ 16

*Trump v. Trump,*
   79 Misc. 3d 866 (Sup. Ct. N.Y. Cnty. 2023) .............................. 13

*United States v. Bird,*
   124 F.3d 667 (5th Cir. 1997) ............................................... 17

*United States v. Dinwiddie,*
   76 F.3d 913 (8th Cir. 1996) ................................................. 17

*United States v. Dugan,*
   450 F. App'x 20 (2d Cir. 2011) ............................................. 12

*United States v. Guest,*
   383 U.S. 745 (1966).............................................................. 10

*United States v. Sewell,*
   513 F.3d 820 (8th Cir. 2008) ................................................ 12

*United States v. Sherman,*
   581 F.2d 1358 (9th Cir. 1978) .............................................. 13

*United States v. Williams,*
   341 U.S. 70 (1951).................................................................. 8

*United States v. Yung,*
   37 F.4th 70 (3d Cir. 2022) .................................................... 15

**Statutes**

18 U.S.C. § 2261A.................................................................. 15

18 U.S.C. § 241........................................................................ 4

18 U.S.C. § 248....................................................................... 4

18 U.S.C. § 248(a)(2)..................................................................................... 5, 12, 16, 17

Act of May 31, 1870, 16 Stat. 141 (May 31, 1870) ...................................................... 8

**Other Authorities**

Adam G. Safwat, *Section 241 and the First Amendment: Avoiding a False Conflict Through Proper Mens Rea Analysis*,
43 Duke L. J. 625 (1993) ........................................................................................ 9

Andy Mannix, *Los Angeles Times Reporters Assaulted by Minnesota State Patrol During Unrest, Lawsuit Says*, Minn. Star Trib. (May 26, 2021),
https://perma.cc/PPX9-RS8Q. ............................................................................... 15

Brief of Reporters Committee for Freedom of the Press and 23 Media Organizations, *The New York Times Co., et al. v. Department of Defense, et al.*,
No.1:25-cv-4218-PLF, ECF No. 17-1 (D.D.C. Jan. 15, 2026).................................... 2

Brief of Reporters Committee for Freedom of the Press, *The Associated Press v. Budowich*,
No. 1:25-cv-0532, ECF No. 21 (D.D.C Feb. 24, 2025)............................................. 2

Brief of the Reporters Committee for Freedom of the Press and 44 Media Organizations, *Los Angeles Press Club v. Noem*,
No. 25-5975, 2026 WL 889142 (9th Cir. 2026) ...................................................... 2

Brief of the Reporters Committee for Freedom of the Press and 60 Media Organizations, *Index Newspapers, LLC v. U.S. Marshals Serv.*
(9th Cir. Nov. 23, 2020) (No. 20-35739).................................................................. 2

Bruce D. Brown & Gabe Rottman, *Opinion: Claiming a 'Computer Crime' Shouldn't Give Police a Free Pass to Raid Newspapers*, L.A. Times (Aug. 31, 2023),
https://perma.cc/BL3E-9SJR ................................................................................ 14

*Calumet City Tickets Reporter for Asking Too Many Questions, in Latest First Amendment Dustup*, WTTW (Nov. 3, 2023),
https://bit.ly/4wmdusg. ....................................................................................... 14

Dep't of Justice, Investigation of the City of Minneapolis and the Minneapolis Police Department (2023),
https://perma.cc/SFK7-S22J ................................................................................... 7

Dep't of Justice, Investigation of the Louisville Metro Police Department and Louisville Metro Government (2023),
https://perma.cc/7Q3Q-D29S.................................................................................. 7

Dep't of Justice, Police-Media Interactions During Mass Demonstrations 5 (2024),
https://perma.cc/N8YS-9NPQ ................................................................................. 6

*Freed Klansmen to Fight New Penn Case Charges*, N.Y. Times (Sept. 6, 1964),
https://perma.cc/78NT-MVR4 ................................................................................ 10

Katie Shepherd, *A Reporter Tried to Ask Rep. Marjorie Taylor Greene About Her False Claims. The Journalist was Threatened with Arrest*, Wash. Post (Jan. 28, 2021),
https://bit.ly/45ayozo ........................................................................................... 15

Michael Schmidt, *F.B.I. Said to Have Investigated Times Reporter After Article on Patel's Girlfriend*, N.Y. Times (Apr. 22, 2026),
https://perma.cc/WS89-JR3F ................................................................................ 15

*Racial Tensions in America's 'Sundown Towns'*, A.P.,
https://perma.cc/V5QZ-2XE7 .............................................................................. 10

Suetonius, Lives of the Twelve Caesars ............................................................................. 9

**STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE**

Amici curiae are the Reporters Committee for Freedom of the Press, and the following 45 news and media organizations: Advance Publications, Inc., The Associated Press, The Atlantic Monthly Group LLC, Boston Globe Media Partners, LLC, The Center for Investigative Reporting, Dow Jones & Company, Inc., First Amendment Coalition, Free Press, Institute for Nonprofit News, Inter American Press Association, The Intercept Media, Inc., Investigative Studios, Knight First Amendment Institute at Columbia University, The McClatchy Company, LLC, The Media Institute, Media Law Resource Center, MediaNews Group Inc., Minnesota Newspaper Association, Minnesota Reformer, MinnPost, MS NOW, National Freedom of Information Coalition, National Newspaper Association, National Press Club Journalism Institute, The National Press Club, National Press Photographers Association, New England First Amendment Coalition, The New York Times Company, Newsday LLC, The NewsGuild-CWA, Online News Association, Open Vallejo, PEN America, Pro Publica, Inc., Radio Television Digital News Association, The Seattle Times Company, Slate, Society of Environmental Journalists, Society of Professional Journalists, The St. Paul Pioneer Press, Student Press Law Center, Tully Center for Free Speech, Vox Media Group, LLC, Vox Media, LLC, and The Washington Post.

As news entities and organizations representing the interests of journalists and media outlets actively engaged in newsgathering and reporting on protests throughout the country, amici have a keen interest in ensuring that newsgathering at protests and demonstrations may continue to take place without the chilling effect of criminal charges. Amici write to explain why the superseding indictment must be dismissed as to Defendants Don Lemon and Georgia Fort. The specific intent requirement in the charging statutes serves an important First

1

Amendment purpose by excluding journalists whose goal is simply to cover protests. Furthermore, if the case were allowed to proceed against Defendants, prosecutors would be able to use the statutes' broad and vague language to target journalists who question witnesses in public spaces – activity that is unquestionably protected under the First Amendment.

Lead amicus the Reporters Committee is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.[1]  The Reporters Committee regularly files as amicus in cases involving issues relating to the ability of the press to gather and publish news.  *See, e.g.*, Brief of the Reporters Committee for Freedom of the Press and 44 Media Organizations, *Los Angeles Press Club v. Noem*, No. 25-5975, 2026 WL 889142 (9th Cir. 2026); Brief of Reporters Committee for Freedom of the Press and 23 Media Organizations, *The New York Times Co., et al. v. Department of Defense, et al.*, No.1:25-cv-4218-PLF, ECF No. 17-1 (D.D.C. Jan. 15, 2026); Brief of Reporters Committee for Freedom of the Press, *The Associated Press v. Budowich*, No. 1:25-cv-0532, ECF No. 21 (D.D.C Feb. 24, 2025); Brief of the Reporters Committee for Freedom of the Press and 60 Media Organizations, *Index Newspapers, LLC v. U.S. Marshals Serv.* (9th Cir. Nov. 23, 2020) (No. 20-35739).

No party or party's counsel authored this brief in whole or in part, or made a monetary contribution intended to fund its preparation or submission.  No person other than amici made a monetary contribution to the preparation or submission of this brief.

---

[1] Statements of interest of individual amici are set forth in the addendum to this brief.

2

For the reasons herein, amici respectfully urge the Court to grant Defendants Don Lemon's and Georgia Fort's motions to dismiss under the First Amendment.

**INTRODUCTION**

The public benefits when reporters move in close to cover the places where news happens, whether mass protests, crime scenes, or other breaking news and public safety incidents.  But given the nature of their profession, journalists often encounter situations where they are physically proximate to – but do not participate in – the unlawful acts of others.  From time to time, public officials improperly target them with various theories of liability in efforts to criminalize this kind of spot news coverage.  Everyday newsgathering activities such as recording, broadcasting, livestreaming, and questioning participants and witnesses have through the years ended in arrests, investigations, and occasionally prosecutions that turn out to be hasty and unwarranted.  Such efforts often involve the novel application of broadly worded and overly vague public order offenses – like failure to disperse, trespass, or disorderly conduct – in an attempt to sweep in journalistic activity.

But nothing in past prosecutorial misadventures, at either the state or federal level, captures the extreme government overcharging in this case.  For the first time, the Justice Department has deployed two highly potent civil rights statutes against journalists, the movants here, who, based on documentary footage, followed a protest into a church and covered the interactions between the parishioners and the protestors by filming and questioning the people present on the scene.  The journalists have filed motions to dismiss the superseding indictment on First Amendment grounds.  ECF No. 592; ECF No. 609.  Amici write to emphasize that the statutes under which the journalists were charged – the Freedom of Access to Clinic Entrances ("FACE") Act, 18 U.S.C. § 248, and 18 U.S.C. § 241, the conspiracy against rights criminal statute ("Section 241") – cannot be applied to their newsgathering conduct for two reasons.

4

First, FACE and Section 241 are both specific intent statutes, which means the government must establish as an element of the offense that a defendant subjectively intended to deprive the covered individual of the protected right. Here, that is the right under FACE to be free from private, non-state intrusions on the "right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2). Journalists who are present at the scene of a protest in or near a place of religious worship with the intent to cover a news story will lack this state of mind because they are there for an entirely different purpose. In this sense, the specific intent requirement under both statutes functions like the standard tailoring required under the First Amendment for public order offenses utilized against journalists. That is, the intent standard, like tailoring, serves as a safety valve to ensure that protected First Amendment activity, especially by journalists, cannot be conjured into a criminal conspiracy based purely on proximity to the allegedly illegal acts of others.

Second, were the Court to credit the indictment here, both FACE and Section 241 would present significant overbreadth and vagueness infirmities. FACE and Section 241, as read together, criminalize the act of two or more individuals conspiring to, "by force or threat of force or by physical obstruction, intentionally injure[], intimidate[] or interfere[] with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2). Under the government's reading of the statutes, prosecutors could use that broad and vague language to target journalists for merely asking questions of protesters or bystanders convened in public spaces outside of a church – First Amendment-protected activity that occurs all the time. And it should be beyond a doubt that the act of asking questions of witnesses to a newsworthy event, whether the questioner is a journalist or a passer-by, is not a crime.

5

For both of these reasons, amici urge this Court to grant Defendants' motions to dismiss under the First Amendment.

## ARGUMENT

I.      **Journalists intending to cover a story lack the specific intent to deprive individuals of a clearly defined right under FACE and Section 241 and therefore cannot be held criminally liable.**

   A.   **Public order laws must be tailored to protect against infringement of First Amendment activity.**

The proposition that a bystander, including a journalist, may not be punished for the unlawful acts of another due to mere proximity to those acts is clear and well established. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 925 & n.69 (1982) (rejecting the theory that a protest organizer has a duty to "disassociate" himself from others' unlawful acts to avoid liability). The specifics of the law as applied to journalists covering protest activity has continued to develop since *Claiborne*. For example, in various federal pattern-or-practice investigations – in which DOJ examines whether there is a pattern or practice of unlawful conduct at a law enforcement agency – the Justice Department has taken the position that journalists may have a First Amendment right to remain on the scene even when an otherwise lawful dispersal order has been issued by police under the theory that journalists cannot be held responsible for individuals breaking the law nearby. *See* Dep't of Justice, Police-Media Interactions During Mass Demonstrations 5 (2024), https://perma.cc/N8YS-9NPQ (summarizing Department's position and referencing pattern-or-practice investigations). While citing to different lines of First Amendment doctrine, the Department in each case recognized that the public order laws underpinning these dispersal orders – necessarily written broadly given the manifold forms that disorderly conduct, obstruction, or other similar activity can take – require

6

some limiting principle to ensure they do not trench on First Amendment protections for the press and public.

For instance, in the Minneapolis Police Department investigative report – which followed the conviction of MPD officer Derek Chauvin for the murder of George Floyd – the Department cited First Amendment retaliation doctrine and forum analysis to ground that constitutional protection. *See* Dep't of Justice, Investigation of the City of Minneapolis and the Minneapolis Police Department 52 (2023), https://perma.cc/SFK7-S22J.  The Department found that blanket enforcement of dispersal orders would be unconstitutional because (1) the First Amendment prohibits retaliation against people who gather the news, including by restricting journalists' access during protests, and (2) the First Amendment requires that any time, place, and manner restrictions leave open alternative channels for newsgathering.  Meanwhile, in the Louisville Metro Police Department investigative report, which followed the 2020 murder of Breonna Taylor by Louisville police officers, the Department noted that "[l]aw-abiding journalists naturally got caught up in LMPD's indiscriminate responses to the 2020 protests" and found that the LMPD violated the qualified First Amendment right of access to observe government activities. *See* Dep't of Justice, Investigation of the Louisville Metro Police Department and Louisville Metro Government 55 (2023), https://perma.cc/7Q3Q-D29S.

In short, limiting principles are necessary to ensure that broad public order laws do not impinge on newsgathering.  Justice Black described one such law as a "meat-ax ordinance, gathering in one comprehensive definition of an offense a number of words which have a multiplicity of meanings, some of which would cover activity specifically protected by the First Amendment." *Gregory v. City of Chicago*, 394 U.S. 111, 118–19 (1969) (Black, J., concurring). The solution to the "meat-ax" problem is to ensure some means-ends fit between the state

7

interest asserted and the particular type of speech suppressed. *See, e.g.*, *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 831 (9th Cir. 2020) (upholding injunction exempting journalists from general dispersal orders, finding that police must demonstrate an "overriding interest" before restricting access to public spaces, and holding that any closure be "narrowly tailored" to serve that interest); *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 116–17 (D. Minn. 2021) (same).

The journalists argue that the indictment does not satisfy the specific intent that Section 241 and FACE require. ECF No. 593 at 11–12, 20; ECF No. 609 at 19–21. Amici explain that the purpose that intent requirement serves is to avoid sweeping in protected newsgathering activity.

## B. The limiting principle of Section 241 is the high mens rea requirement.

Section 241 presents a similar problem as those inherent in general public order laws – its scope encompasses a wide breadth of potential rights violations. But Congress and the courts have erected a slightly different limiting solution to avoid overbreadth: a mens rea requirement that a defendant specifically intend to deprive another of the protected right. In relevant part, Section 241 provides that, "if two or more persons conspire to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same," they violate the law. The provision is the surviving text from Section 6 of the first Ku Klux Klan Act or Force Act of 1870, one of the Reconstruction-era statutes designed to protect the constitutional rights of recently freed Black citizens. *See* Act of May 31, 1870, 16 Stat. 141 (May 31, 1870); *United States v. Williams*, 341 U.S. 70, 83 (1951) (tracking the phraseology of the criminal civil rights statutes across successive codifications). Congress and the U.S. Supreme Court, however, have long recognized that Section 241 and its companion statute, now

8

18 U.S.C. § 242, could become proverbial meat-ax ordinances given the broad, frequently changing, and difficult-to-predict array of conduct that could give rise to a deprivation of rights under either the U.S. Constitution or federal law.

To mitigate that risk, Sections 241 and 242 have long been held to require, as an element of the offense, the specific intent to deprive another of a clearly defined right. *See* Adam G. Safwat, *Section 241 and the First Amendment: Avoiding a False Conflict Through Proper Mens Rea Analysis*, 43 Duke L. J. 625, 633–38 (1993) (surveying caselaw requiring specific intent and a clearly defined constitutional or statutory right). For Section 242, the U.S. Supreme Court initially confirmed the specific intent requirement in *Screws v. United States*, in which several police officers were charged federally under Section 242 for acting under color of law to deprive a Black man of his Fourteenth Amendment due process rights by beating him to death in custody. 325 U.S. 91, 92–93 (1945). While decrying the "shocking and revolting episode," the Court cautioned that by referencing a "large body of changing and uncertain law" – the entire panoply of constitutional and statutory rights – Section 242 could operate to "refer[] the citizen to a comprehensive law library" to determine which acts are prohibited. *Id.* at 92, 96, 98. Enforcing such a broadly written statute, the Court said, "would be like sanctioning the practice of Caligula who 'published the law, but it was written in a very small hand, and posted up in a corner, so that no one could make a copy of it.'" *Id.* At 96 (quoting Suetonius, Lives of the Twelve Caesars at 278). The Court held that the answer was to construe Section 242 to require specific intent to deprive an individual of a clearly defined right. *Id.* at 104 ("[T]he specific intent required by the Act is an intent to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or decisions interpreting them.").

9

The Court confirmed that the specific intent standard applicable to Section 242 applies equally to Section 241 in *United States v. Guest*, 383 U.S. 745 (1966). *Guest* arose out of the Klan murder in Georgia of Lt. Col. Lemuel Penn as he drove home to Washington, D.C. *See Freed Klansmen to Fight New Penn Case Charges*, N.Y. Times (Sept. 6, 1964), https://perma.cc/78NT-MVR4. Acquitted at a state trial, the defendants were indicted on federal conspiracy charges under Section 241 for allegedly violating the rights of Black people under various constitutional and statutory theories. One in particular is illustrative of how the specific intent standard under Section 241 works in practice.

The fourth paragraph of the indictment alleged that the defendants conspired to deprive Black people of the constitutional right to interstate travel. *Guest*, 383 U.S. at 757. Reversing the district court's dismissal of that charge, the Court nonetheless cautioned that not "every criminal conspiracy affecting an individual's right of free interstate passage is within the sanction" of Section 241. *Id.* at 760. For instance, a conspiracy to *rob* an interstate traveler would be outside the ambit of Section 241. Rather, the government must prove that the intent of the conspiracy was to interfere with the right to travel. *Id.* ("But if the predominant purpose of the conspiracy is to impede or prevent the exercise of the right of interstate travel, or to oppress a person because of the exercise of that right, then, whether or not motivated by racial discrimination, the conspiracy becomes a proper object of the federal law under which the indictment in this case was brought."). In other words, a gang of highwaymen may not be found to conspire to violate Section 241 whereas a "sundown town" vigilante posse might. *See Racial Tensions in America's 'Sundown Towns'*, A.P., https://perma.cc/V5QZ-2XE7 (last visited July 14, 2026) (describing communities that would expel Black and other non-white people after sunset).

10

Finally, in *Bray v. Alexandria Women's Health Clinic*, the Court further explored the requisite mental showing for a Section 241 violation. *Bray* considered whether 42 U.S.C. § 1985(3), the civil counterpart to Section 241, provides a cause of action against protesters for obstructing access to abortion clinics. 506 U.S. 263, 266 (1993). The Court's decision makes clear that the defendant must subjectively harbor the desire to deprive another of a protected right. It is not enough for the alleged conspiracy to merely affect the exercise of the protected right. *Id.* at 275 ("[I]t does not suffice . . . that a protected right be incidentally affected."). Rather, the "impairment must be a conscious objective of the enterprise." *Id.* That is, the "'intent to deprive of a right' requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it." *Id.* at 276. In *Bray*, Justice Scalia, writing for the Court's majority viewpoint, found that not to be the case with respect to the effect that anti-abortion protest activity had on abortion seekers' right of interstate travel. The Court held it to be "implausible" that an intent to violate that right could exist as defendants in the case "oppose abortion, and it is irrelevant to their opposition whether the abortion is performed after interstate travel." *Id.*

### C.  The mens rea requirement is also a limiting principle of the FACE Act.

Coincidentally, the *Bray* case, in which the Court declined to recognize a private right of action against anti-abortion protesters under the civil counterpart to Section 241, led Congress to pass FACE, which prohibits non-state interference in individuals' access to abortion services. *See New York State Nat. Org. for Women v. Terry*, 159 F.3d 86, 97 (2d Cir. 1998). In the bill, Congress extended the prohibition to interference with the freedom of religion at places of religious worship. To prosecute a criminal conspiracy to violate the FACE Act, the government will bring FACE Act claims alongside Section 241 charges as FACE is what creates the specific

11

statutory right the deprivation of which is reachable under Section 241.  The FACE Act is expressly a specific intent statute, 18 U.S.C. § 248(a)(2) (requiring an "intentional[]" violation), and courts have consistently held as much, *see Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002) ("[T]he [FACE] Act is a specific intent statute."); *see also United States v. Dugan*, 450 F. App'x 20, 22 (2d Cir. 2011) (affirming district court's finding of specific intent based on statements by defendant who knelt before clinic door that he was "captured while performing a duty" to "interven[e] against the slaughter of our unborn citizens").

Accordingly, while specific intent may be supported through circumstantial or inferential evidence, there is no question that it is an element of the alleged offenses in this case and the indictment must sufficiently allege that element.  *See United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008) (indictment must contain "all of the essential elements of the offense charged").  As relevant here, the government must provide an adequate factual basis to support the proposition that the journalists (1) by force or threat of force or by physical obstruction, (2) intentionally injured, intimidated, or interfered with (or attempted to do the same), (3) any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship.  18 U.S.C. § 248(a)(2).  The government need not allege that the journalists *knew* specifically about the FACE Act's proscriptions, *cf. Screws*, 325 U.S. at 106 (defendant need not be "thinking in constitutional terms"), but the facts as alleged must present enough support that the journalists harbored a subjective desire to deprive the Cities Church congregants of their rights under the FACE Act.

It is self-evident that a journalist who is merely next to someone who allegedly harbors that subjective intent simply will not have the requisite state of mind to conspire in the underlying offense.  Put another way, as the Court found in *Bray* with respect to anti-abortion

12

protesters and the right to interstate travel, the notion that a journalist doing his or her job would have the intent to deprive people of their right to religious worship under FACE "is on its face implausible." 506 U.S. at 276. Rather, the journalist's intent is to document the incident to disseminate a report on it to the public. The deployment of the FACE Act and Section 241 against a journalist for covering a planned protest in a church, without more, thus fails to satisfy the high mens rea requirement in both laws. Reporters and demonstrators may walk through the same door, but they have entirely diverging objectives when they get inside.

II.     **If the Court allows the government's case to move forward, the FACE Act and Section 241 could be used to target journalists asking questions in public spaces, rendering the statutes unconstitutionally vague and overbroad.**

The First Amendment protects not just the right to speak but also the right "to inquire," *Citizens United v. FEC*, 558 U.S. 310, 339 (2010), including through "routine newspaper reporting techniques" such as asking questions of public officials and others, *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979). That robust protection has been confirmed repeatedly across multiple contexts. *See, e.g.*, *In re Express News-Corp.*, 695 F.2d 807, 808–09 (5th Cir. 1982) (First Amendment protects questioning of jurors); *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978) (same); *Daily Herald Co. v. Munro*, 838 F.2d 380, 384 (9th Cir. 1988) (exit polling protected under First Amendment). Indeed, these protections for the gathering of news are so strong that they apply even when a reporter pursues information acquired illegally by another or where questioning may lead to a breach of a confidentiality agreement. *See, e.g.*, *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 436 (S.D.N.Y. 2019) (finding that journalists are permitted to ask for documents that have been stolen); *Trump v. Trump*, 79 Misc. 3d 866, 882 (Sup. Ct. N.Y. Cnty. 2023) (failing to find "a single case where any court, whether state or federal, has held that a reporter is liable for

13

inducing his or her source to breach a confidentiality provision"). It should be abundantly clear that the interviewing of witnesses and bystanders to newsworthy events, customary in much local and national journalism, fits comfortably within this zone of constitutional protection.

### A. Public officials have sought to deploy broadly worded laws to treat newsgathering as criminal activity.

Government officials have occasionally sought to bootstrap potential liability for a reporter's questioning onto any measure that could offer a crumb of textual support for it, using statutes or ordinances of indeterminate phrasing and broad sweep. *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 728 (1988) (Scalia, J., dissenting) (noting danger of law enforcement "picking the man and then searching the law books"). For instance, in 2023, officials in Calumet City, Illinois, issued a number of citations to Daily Southtown reporter Hank Sanders under the municipal "interference/hampering of city employees" ordinance for frequent contacts with the city to gather information for a story on flooding in the community. The gravamen of the offense was sending 14 emails during a nine-day period. *See Calumet City Tickets Reporter for Asking Too Many Questions, in Latest First Amendment Dustup*, WTTW (Nov. 3, 2023), https://bit.ly/4wmdusg.

The Calumet City incident followed the high-profile raid of the Marion County Record newsroom in response to its newsgathering efforts regarding a local resident. Leveraging the vague Kansas computer crime and identity theft statutes, the police chief secured a warrant for the raid predicated on Record reporters confirming information through a publicly accessible state website. Bruce D. Brown & Gabe Rottman, *Opinion: Claiming a 'Computer Crime' Shouldn't Give Police a Free Pass to Raid Newspapers*, L.A. Times (Aug. 31, 2023), https://perma.cc/BL3E-9SJR.

And more recently the New York Times reported that the same Justice Department that filed the charges at issue here against journalists had investigated Times reporter Elizabeth Williamson under federal stalking laws for asking questions about FBI resources being used to provide FBI Director Kash Patel's girlfriend with security and transportation.  *See* Michael Schmidt, *F.B.I. Said to Have Investigated Times Reporter After Article on Patel's Girlfriend*, N.Y. Times (Apr. 22, 2026), https://perma.cc/WS89-JR3F.  Indeed, the federal stalking laws, like the charging statutes in this case, are another example of overbroad and vague authorities that, absent a limiting construction, could suppress newsgathering.  *See* 18 U.S.C. § 2261A (criminalizing causing, attempting to cause, or engaging in conduct that "would be reasonably expected to cause substantial emotional distress" with intent to "harass" or "intimidate"); *United States v. Yung*, 37 F.4th 70, 80–81 (3d Cir. 2022) (applying a limiting construction to § 2261A to avoid constitutional overbreadth concerns).

Public officials have also looked to trespass statutes to relieve them of the presence of a journalist when they don't like the questions the reporter has asked at town halls or in press conferences.  *See, e.g.*, Katie Shepherd, *A Reporter Tried to Ask Rep. Marjorie Taylor Greene About Her False Claims.  The Journalist was Threatened with Arrest*, Wash. Post (Jan. 28, 2021), https://bit.ly/45ayozo.  And journalists have been arrested and injured by law enforcement while covering protest activity, including when questioning witnesses to a demonstration.  *See, e.g.*, Andy Mannix, *Los Angeles Times Reporters Assaulted by Minnesota State Patrol During Unrest, Lawsuit Says*, Minn. Star Trib. (May 26, 2021), https://perma.cc/PPX9-RS8Q.

These are just a few examples of obvious overreach – efforts to apply "meat-ax" statutes to typical newsgathering activity.

**B. The government's case against the journalists risks additional interpretations of the statutes that would further criminalize protected journalistic activity, including interviewing witnesses in public.**

It would be constitutionally hazardous to read the FACE Act's and Section 241's indeterminate language as applying more broadly, including to journalistic activity in public spaces. When charged together, they criminalize the use of "physical obstruction" to "interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2). The government here appears to be alleging that journalists questioning those present at a protest either inside *or outside* a place of worship are engaged in physical obstruction in violation of the law.

Yet there is no doubt that a journalist gathering information in a public space, including outside of a place of worship, is protected First Amendment activity. *See, e.g.*, *Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 839 (8th Cir. 2021) (denying qualified immunity for First Amendment violation of firing tear-gas canister at television news crew preparing for live shot); *Chestnut v. Wallace*, 947 F.3d 1085, 1090–91 (8th Cir. 2020) (denying qualified immunity to officer who detained man for observing arrest); *see also Garcia v. Cnty. of Alameda*, 150 F.4th 1224, 1233 (9th Cir. 2025) (holding reporter was likely to succeed on the merits of his claim challenging ordinance that banned spectators from automotive sideshows as applied to his coverage of those events). Accordingly, if the FACE Act and Section 241 were to be read as the government alleges to permit conspiracy charges against journalists for interviewing protesters and bystanders outside of a house of worship, they would pose serious overbreadth and vagueness concerns.

With respect to overbreadth, the construction of FACE and Section 241 advocated by the government would sweep in a substantial amount of constitutionally protected newsgathering. *See Thornhill v. Alabama*, 310 U.S. 88 (1940) (invalidating law barring all loitering near or

16

picketing businesses with intent to interfere). And permitting the use of the FACE Act and Section 241 against newsgathering activity would carry the policy concerns that underpin overbreadth doctrine: The laws could be used selectively to suppress news reporting perceived as critical or unfavorable, and the breadth of the laws could disguise content- or viewpoint-based discriminatory enforcement. *See City of Houston v. Hill*, 482 U.S. 451, 466–67 (1987) (invalidating ordinance prohibiting interruption of police officers in their duties, the plain language of which is "admittedly violated scores of times daily, yet only some individuals – those chosen by the police in their unguided discretion – are arrested") (internal citation omitted).

Likewise, such a construction would pose vagueness concerns. Journalists interviewing people near a house of worship will be unable to determine what, for instance, would constitute "physical obstruction," "intentional[] . . . interfere[nce]," or even the scope of the "right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2). While courts have found that the FACE Act requires some physical obstruction, *see, e.g.*, *United States v. Bird*, 124 F.3d 667, 684 (5th Cir. 1997) (analogizing to statute proscribing picketing that obstructs or interferes with ingress or egress to any public premises and finding FACE Act not unconstitutionally vague); *United States v. Dinwiddie*, 76 F.3d 913, 917 n.1 (8th Cir. 1996) (pointing to statutory definition of "physical obstruction" as "rendering impassable ingress to or egress from . . . a place of religious worship" and rejecting vagueness arguments), in a case where conspiracy is alleged, journalists would have difficulty determining what level of engagement with protesters could steer them into the unlawful zone. Reporters frequently receive tips from protesters or other sources in advance of a protest so they can cover the unfolding events. Indeed, the journalists' presence at the planning meeting is alleged in the

17

indictment here.  ECF No. 144 ¶ 7(b).  Were that common, garden-variety journalistic practice to be swept within FACE and Section 241, federal law would be within arm's reach of prosecutors to muzzle reporting in the public interest.

In sum, the use of the FACE Act and Section 241 in the manner presented by this case raises serious concerns that the laws will be used to target reporters asking questions of participants and bystanders at mass demonstration activity near places where people pray.  Were that so, the laws would outstrip their proper bounds as provisions meant to proscribe actual, physical restraints on ingress or egress from reproductive health clinics and houses of worship.

## CONCLUSION

For the reasons given herein, amici respectfully urge the Court to grant Defendants Lemon's and Fort's motions to dismiss the superseding indictment under the First Amendment.

Dated: August 12, 2026                          Respectfully submitted,

                                                          */s Mark R. Anfinson*
                                                          Mark Anfinson
                                                          Minn. Bar No. 2744
                                                          Uptown Professional Building
                                                          3109 Hennepin Avenue South
                                                          Minneapolis, MN  55408
                                                          Phone: 612-827-5611
                                                          Facsimile: 612-827-3564
                                                          mranfinsonlaw@gmail.com

                                                          Bruce D. Brown
                                                          Lisa Zycherman
                                                          Gabe Rottman
                                                          Marietta Catsambas
                                                          REPORTERS COMMITTEE FOR
                                                           FREEDOM OF THE PRESS
                                                          1156 15th St. NW, Suite 1020
                                                          Washington, DC 20005
                                                          Phone: 202.795.9300
                                                          Facsimile: 202.795.9310
                                                          bruce.brown@rcfp.org

18

_Counsel for Amicus Curiae the Reporters_
_Committee for Freedom of the Press_

19

**ADDENDUM: STATEMENTS OF INTEREST OF AMICI CURIAE**

Advance Publications, Inc. is a diversified privately-held company that operates and invests in a broad range of media, communications and technology businesses. Its operating businesses include Conde Nast's global magazine and digital brand portfolio, including titles such as Vogue, Vanity Fair, The New Yorker, Wired, and GQ, local news media companies producing newspapers and digital properties in 10 different metro areas and states, and American City Business Journals, publisher of business journals in over 40 cities.

The Associated Press ("AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York. The AP's members and subscribers include the nation's newspapers, magazines, broadcasters, cable news services and Internet content providers. The AP operates from 280 locations in more than 100 countries. On any given day, AP's content can reach more than half of the world's population.

The Atlantic Monthly Group LLC is the publisher of *The Atlantic* and TheAtlantic.com. Founded in 1857 by Oliver Wendell Holmes, Ralph Waldo Emerson, Henry Wadsworth Longfellow and others, *The Atlantic* continues its 160-year tradition of publishing award-winning journalism that challenges assumptions and pursues truth, covering national and international affairs, politics and public policy, business, culture, technology and related areas.

Boston Globe Media Partners, LLC publishes The Boston Globe, the largest daily newspaper in New England.

The Center for Investigative Reporting, Inc. is the nation's oldest nonprofit investigative newsroom in the country that runs the brands Mother Jones, Reveal, and CIR Studios. Mother Jones is a reader-supported news magazine and website known for ground-breaking investigative and in-depth journalism on issues of national and global significance. Reveal produces

20

investigative journalism for the Reveal national public radio show and podcast, and CIR Studios produces feature length documentaries distributed on Netflix, Hulu and other streaming channels. Reveal often works in collaboration with other newsrooms across the country.

Dow Jones & Company is the world's leading provider of news and business information. Through The Wall Street Journal, Barron's, MarketWatch, Dow Jones Newswires, and its other publications, Dow Jones has produced journalism of unrivaled quality for more than 130 years and today has one of the world's largest newsgathering operations. Dow Jones's professional information services, including the Factiva news database and Dow Jones Risk & Compliance, ensure that businesses worldwide have the data and facts they need to make intelligent decisions. Dow Jones is a News Corp company.

First Amendment Coalition (FAC) is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. FAC advances this purpose by working to improve governmental compliance with state and federal open government laws. FAC's activities include free legal consultations on access to public records and First Amendment issues, educational programs, legislative oversight of California bills affecting access to government records and free speech, and public advocacy, including extensive litigation and appellate work. FAC's members are news organizations, law firms, libraries, civic organizations, academics, freelance journalists, bloggers, activists, and ordinary citizens.

Free Press is a national, nonpartisan, non-profit organization with approximately 1.5 million members in the United States and around the world. It works to defend Internet freedom

21

and press freedom, including the right of journalists and others to gather and report on information as well as the public's right to see, hear and read that information – both of which are crucial to a functioning democracy.  Free Press has participated in numerous court and agency proceedings on media, telecommunications, and technology law topics, including those involving First Amendment issues, since the organization's founding in 2003.

The Institute for Nonprofit News is a nonprofit charitable organization that provides education and business support services to our nonprofit member organizations and promotes the value and benefit of public service and investigative journalism.

The Inter American Press Association (IAPA) is a not-for-profit organization dedicated to the defense and promotion of freedom of the press and of expression in the Americas.  It is made up of more than 1,300 publications from throughout the Western Hemisphere and is based in Miami, Florida.

The Intercept Media, Inc. is a non-profit digital media venture committed to rigorous, adversarial journalism in the public interest.

Investigative Studios Inc. is a nonprofit 501(c)(3) with an independent board and is formally affiliated with the University of California, Berkeley.  It is dedicated primarily to producing and reporting journalism in the public interest that is authored by the University's Investigative Reporting Program.

The Knight First Amendment Institute at Columbia University ("Knight Institute") is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press through strategic litigation, research, and public education.  The Knight Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government.

The McClatchy Company, LLC is a publisher of iconic brands such as the *Miami Herald*, *The Kansas City Star*, *The Sacramento Bee*, *The Charlotte Observer*, *The* (Raleigh) *News & Observer*, and the *Fort Worth Star-Telegram*.  McClatchy operates media companies in 30 U.S. markets in 16 states, providing each of its communities with high-quality news and advertising services in a wide array of digital and print formats.  McClatchy is headquartered in Sacramento, California.

The Media Institute is a nonprofit foundation specializing in communications policy issues founded in 1979.  The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism.  Its program agenda encompasses all sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

The Media Law Resource Center, Inc. ("MLRC") is a non-profit professional association for content providers in all media, and for their defense lawyers, providing a wide range of resources on media and content law, as well as policy issues.  These include news and analysis of legal, legislative and regulatory developments; litigation resources and practice guides; and national and international media law conferences and meetings.  The MLRC also works with its membership to respond to legislative and policy proposals, and speaks to the press and public on media law and First Amendment issues.  It counts as members over 125 media companies, including newspaper, magazine and book publishers, TV and radio broadcasters, and digital platforms, and over 200 law firms working in the media law field.  The MLRC was founded in 1980 by leading American publishers and broadcasters to assist in defending and protecting free press rights under the First Amendment.

MediaNews Group is a leader in local, multi-platform news and information, distinguished by its award-winning original content and high-quality local media.  It is one of the largest news organizations in the United States, with print and online publications across the country.

The Minnesota Newspaper Association (MNA) is the voluntary trade association of all general-interest newspapers in the State of Minnesota, acting on behalf of the newspaper press of the state, representing its members in the legislature and in court, and working to enhance the quality of the state's newspapers.

The Minnesota Reformer is a nonprofit, nonpartisan news organization covering state politics and policy. It focuses on enterprise journalism – investigations, analysis, storytelling.

MinnPost is an independent, nonprofit newsroom producing in-depth reporting on the most consequential civic and cultural affairs in Minnesota.  It publishes news and analysis based on reporting by professional journalists who strive to uphold the highest standards of fairness and accuracy.

MS NOW, previously MSNBC, is a multiplatform news organization that reaches millions across television, online, and through social media.  MS NOW's mission is to serve as a trusted destination for domestic and international breaking news and best-in-class opinion journalism.

The National Freedom of Information Coalition is a national nonprofit, nonpartisan organization of state and regional affiliates representing 45 states and the District of Columbia. Through its programs and services and national member network, NFOIC promotes press freedom, litigation and legislative and administrative reforms that ensure open, transparent and accessible state and local governments and public institutions.

24

National Newspaper Association is a 2,000-member organization of community newspapers founded in 1885. Its members include weekly and small daily newspapers across the United States. It is based in Pensacola, FL.

The National Press Club Journalism Institute is the non-profit affiliate of the National Press Club, founded to advance journalistic excellence for a transparent society. A free and independent press is the cornerstone of public life, empowering engaged citizens to shape democracy. The Institute promotes and defends press freedom worldwide, while training journalists in best practices, professional standards and ethical conduct to foster credibility and integrity.

The National Press Club is the world's leading professional organization for journalists. Founded in 1908, the Club has 3,100 members representing most major news organizations. The Club defends a free press worldwide. Each year, the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

New England First Amendment Coalition is a non-profit organization working in the six New England states to defend, promote and expand public access to government and the work it does. The coalition is a broad-based organization of people who believe in the power of

25

transparency in a democratic society.  Its members include lawyers, journalists, historians and academicians, as well as private citizens and organizations whose core beliefs include the principles of the First Amendment.  The coalition aspires to advance and protect the five freedoms of the First Amendment, and the principle of the public's right to know in our region. In collaboration with other like-minded advocacy organizations, NEFAC also seeks to advance understanding of the First Amendment across the nation and freedom of speech and press issues around the world.

The New York Times Company is the publisher of *The New York Times* and operates the news website nytimes.com.

Newsday LLC ("Newsday") is the publisher of the daily newspaper, Newsday, and related news websites.  Newsday is one of the nation's largest daily newspapers, serving Long Island through its portfolio of print and digital products.  Newsday has received 19 Pulitzer Prizes and other esteemed awards for outstanding journalism.

The News Guild-CWA is a labor organization representing more than 25,000 employees of newspapers, newsmagazines, news services and other media enterprises.  Guild representation comprises, in the main, the editorial and online departments of these media outlets.  The News Guild is a sector of the Communications Workers of America.  CWA is America's largest communications and media union, representing over 500,000 men and women in both private and public sectors.

The Online News Association is the world's largest association of digital journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public.  Membership includes journalists, technologists, executives, academics and students who

26

produce news for and support digital delivery systems.  ONA also hosts the annual Online News Association conference and administers the Online Journalism Awards.

Open Vallejo is an award-winning, independent, non-partisan, nonprofit newsroom serving the public interest.  Open Vallejo seeks to illuminate a small city long burdened by police violence, corruption, and neglect.  As the first project of the Informed California Foundation, Open Vallejo is also a permanent design laboratory for open source, high-impact, broadly-accessible frameworks for ensuring local transparency, accountability, and information justice.

PEN American Center, Inc. ("PEN America") is a nonpartisan nonprofit organization working at the intersection of literature and human rights.  Founded in 1922, PEN America advocates for free expression and the interests of writers and journalists in the United States and abroad.  Its membership includes more than 5,000 writers, journalists, literary professionals, and readers nationwide.  PEN America protects press freedom and journalists by combatting disinformation, defending journalists against online abuse, and supporting local news.

Pro Publica, Inc. ("ProPublica") is an independent, nonprofit newsroom that produces investigative journalism in the public interest.  It has won six Pulitzer Prizes, most recently a 2020 prize for national reporting, the 2019 prize for feature writing, and the 2017 gold medal for public service.  ProPublica is supported almost entirely by philanthropy and offers its articles for republication, both through its website, propublica.org, and directly to leading news organizations selected for maximum impact.  ProPublica has extensive regional and local operations, including ProPublica Illinois, which began publishing in late 2017 and was honored (along with the Chicago Tribune) as a finalist for the 2018 Pulitzer Prize for Local Reporting, an

27

initiative with the Texas Tribune, which launched in March 2020, and a series of Local Reporting Network partnerships.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

The Seattle Times Company, locally owned since 1896, publishes the daily newspaper *The Seattle Times*, together with the *Yakima Herald-Republic* and *Walla Walla Union-Bulletin*, all in Washington state.

The Slate Group publishes Slate, a daily online magazine. Slate features articles and podcasts analyzing news, politics and contemporary culture.

The Society of Environmental Journalists is the only North American membership association of professional journalists dedicated to more and better coverage of environment-related issues.

Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

The St. Paul Pioneer Press is a Pulitzer Prize-winning newspaper based in Saint Paul, Minnesota. It covers the Twin Cities' East Metro region and Western Wisconsin. The Pioneer

28

Press reflects the excellent journalism, distinctive personalities, and tenacious, loyal, and dependable spirit readers and advertisers find in Minnesota's First Newspaper.

Student Press Law Center ("SPLC") is a nonprofit, nonpartisan organization which, since 1974, has been the nation's only legal assistance agency devoted exclusively to educating high school and college journalists about the rights and responsibilities embodied in the First Amendment to the Constitution of the United States.  SPLC provides free legal assistance, information and educational materials for student journalists on a variety of legal topics.

The Tully Center for Free Speech began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

Vox Media Group, LLC owns *New York* Magazine, Vox, and the Vox Media Podcast Network.

Vox Media, LLC owns publications such as The Verge, Eater, The Dodo, and SB Nation.

The Washington Post (formally, WP Company LLC d/b/a The Washington Post) is a news organization based in Washington, D.C.  It publishes The Washington Post newspaper and the website www.washingtonpost.com, and produces a variety of digital and mobile news applications.  The Post has won Pulitzer Prizes for its journalism, including the award in 2020 for explanatory reporting.